The NEW WEST CORPORATION, a California Corporation, d/b/a New West, Plaintiff-Appellant,

v.

NYM COMPANY OF CALIFORNIA, INC., a California Limited Partnership, d/b/a New West Magazine, Defendant-Appellee.

NYM COMPANY OF CALIFORNIA, a California Limited Partnership, d/b/a New West Magazine, Counterclaimant,

v.

The NEW WEST CORPORATION, a California Corporation, Counterdefendant.

No. 76–3234.

United States Court of Appeals, Ninth Circuit.

May 1, 1979.

Keith D. Beecher, Los Angeles, Cal., for plaintiff-appellant.

Kenneth E. Kulzick, Lawrence W. Dam, Los Angeles, Cal., for defendant-appellee.

Before KILKENNY and ANDERSON, Circuit Judges, and SOLOMON, District Judge.*

KILKENNY, Circuit Judge:

This is an appeal from a judgment in a trade-mark case in favor of appellee NYM Company of California, Inc. (NYM) on cross-motions for summary judgment. After finding that there was no genuine issue of material fact, the district court concluded that NYM had established its ownership rights in the trade name and trade-mark "New West" as the title of its magazine and that appellant, The New West Corporation's (NWC) use of the name "New West" on its magazine was likely to cause public confusion. The court further concluded that NWC's use of the name "New West" as the title of its magazine infringed upon NYM's ownership rights in the "New West" trade name and trade-mark and unfairly competed with NYM in violation of 15 U.S.C. § 1125(a).

Each party alleges a use of its mark in interstate commerce. These allegations are not disputed by the parties and are supported by the record.

## FACTS

The facts material to a determination of this case are contained in the district court's opinion. *New West Corp. v. NYM Co. of California, Inc.*, 419 F.Supp. 40, 41–43 (C.D. Cal.1976). We need not respond to appellant's contention that there was insufficient evidence to support the district court's findings of fact numbers 6 and 8 (419 F.Supp. at 43). These findings are surplusage and unnecessary to the decision.

We summarize the material facts as follows: On June 5, 1975, appellee adopted the name "New West" as the title of a new West Coast magazine which it intended to pattern after its existing New York magazine. On June 25, 1975, appellee's trade-mark counsel, after investigation, confirmed to appellee that the trade-mark and trade name "New West" was available for the new magazine. A logo for appellee's New West magazine was prepared on or about September 18, 1975, and was adopted by appellee on September 25, 1975. During the period September 1, 1975, through January 20, 1976, appellee proceeded with the activities prerequisite to launching the new publication. Discussions were held with potential advertisers, distributors and public relations concerns. On December 9, 1975, a dummy issue of appellee's New West magazine was shown to the board of directors of appellee's promoting company, New York Magazine, which authorized the funds required for a direct mailing solicitation to over 400,000 potential subscribers. Other copies of the dummy issue were transported in December, 1975, to trade-mark counsel in Washington, D. C. and to advertising agencies in Connecticut and California. Appellee's dummy issue was a mockup of its eventual magazine. It contained sample advertising and editorial copy and was bound in a four-color cover bearing the New West logo as it actually appeared in regular issues.

Appellee filed a trade-mark application for the "New West" mark on December 23, 1975, which application was later opposed by appellant. On January 20, 1976, appellee publicly announced by way of a press release that the publishers of New York magazine intended to publish a West Coast periodical entitled "New West." On January 24, 1976, a 430,000 piece direct mail solicitation using the "New West" logo on exemplar covers was mailed by appellee to metropolitan areas in California. The first subscription orders for appellee's New West magazine were received on January 27, 1976. By February 5, 1976, a total of 13,883 subscriptions had been received. On February 9, 1976, appellee's promoting corporation, New York Magazine, published its February 23, 1976, issue which contained a special New West supplement prominently displaying the "New West" logo and con-

---

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

taining features of the type eventually carried in New West magazine. Appellee, on February 9, 1976, published 10,000 copies of its inaugural edition which were circulated and sold in various West Coast markets during the ensuing month. Appellee's inaugural edition is substantially similar to appellee's later regular editions. It is identical in size, use of color, features, advertising and style to current issues of New West magazine.

During the period from December 1, 1975, through April 1, 1976, appellee spent approximately $1,300,000.00 to advertise and promote its New West magazine. The magazine is sold primarily through subscriptions and is distributed primarily through the mails. At the time of trial, appellee had in excess of 150,000 subscribers, which subscribers accounted for 75% of the total sales for each issue of the magazine.

The promoters of appellant corporation met on October 19, 1975, and decided upon the format for a feature news magazine which they intended to publish. They adopted the name "New West" for the proposed magazine during the first week of December, 1975, and incorporated in California under the name "The New West Corporation" on December 15, 1976. Prior to January 26, 1976, appellant had not publicly disclosed its intent to publish a magazine entitled "New West", nor had appellant prior to that date sold advertising, solicited subscriptions from the public, contacted distributors, or conducted any promotion for its proposed New West magazine. Prior to January 20, 1976, appellant had not even prepared a logo for its proposed magazine.

The first public announcement that appellant intended to publish a magazine with the name "New West" was made in an article in the Los Angeles Times on January 26, 1976. Said article was initiated by appellant's president after he was aware of appellee's intent to publish a "New West" magazine. Appellant knew of appellee's promotional campaign prior to February 5, 1976. On that date, appellant printed 500 copies of a "Preview Edition" bearing the name of "New West." Said preview edition was 16 pages in length, was entirely black and white, contained no paid advertising, and contained no original feature articles. The original purpose of the preview edition was to show it to potential advertisers. The preview edition was originally scheduled to be printed at a later point in time, but publication was accelerated in an attempt to put it on newsstands prior to any magazine published by appellee. Appellant published only one "regular" edition of its New West magazine in May, 1976 (though it bears a June, 1976, cover date). That issue is 60 pages in length excluding its cover, uses color throughout, contains considerable paid advertising, and features several original articles and stories.

In June, 1976, appellant announced its intent to suspend the publication of further issues. At that date appellant had less than 500 paid subscribers to its New West magazine.

Based upon these undisputed facts, the district court concluded that appellee had established its ownership right in the trade name and trade-mark "New West" as the title of its news magazine. Additionally, the court concluded that appellee had not infringed upon any rights of the appellant, nor had appellee unfairly competed with the appellant.

The court further concluded that the appellant's use and threatened use of the name "New West" as the title of its magazine was likely to cause public confusion with appellee's trade-mark, "New West", and appellee's trade name, "New West Magazine", and that appellant's use of the name "New West" as the title to its magazine infringed upon and misappropriated the ownership rights of the appellee in the "New West" trade-mark and trade name as owned by the appellee. Additionally, the district court concluded, among other things, that the appellant's use of the name "New West" as the title of its magazine unfairly competed with the appellee in violation of 15 U.S.C. § 1125(a). Based upon its findings and conclusions, the district

court entered a partial summary judgment in which it incorporated its conclusions, entered a permanent injunction preventing appellant from using the trade name or trade-mark "New West" or "New West Magazine" and granted appellee's counterclaim against appellant for such an amount of money damages as might be awarded in a subsequent trial, together with costs and reasonable attorney fees as it might later establish at a hearing on that issue.

## ISSUES

I. Did the district court err in granting summary judgment to appellee on the ground that the undisputed facts established its ownership of the trade name and trade-mark "New West?"

II. Did the district court err in holding on summary judgment that appellant's use of the trade name and trade-mark "New West" was likely to cause public confusion and, therefore, infringed upon and unfairly competed with appellee's rights in the mark in violation of the Lanham Act?

III. Did the district court err in awarding attorney fees to appellee?

## I.

Jurisdiction of the district court was based upon 15 U.S.C. § 1121 and an alleged violation of § 43 of the Lanham Act, 15 U.S.C. § 1125, which provides:

"(a) Any person who shall affix, apply, or annex, or *use in connection with any goods* or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or *used in commerce* or deliver the same to any carrier to be transported or used,

shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." [Emphasis supplied.]

Section 1125(a) uses the term "goods." The term covers, among other things: "*Paper and paper articles*, cardboard and cardboard articles; *printed matter, newspaper and periodicals*, books; bookbinding material; . . ." 37 C.F.R. Part 6, § 6.1–16.[1] [Emphasis supplied.] This regulation and its definition of goods have been upheld by the courts. *Glenn v. Advertising Publications, Inc.*, 251 F.Supp. 889, 903 (S.D.N.Y. 1966).

In construing this section the courts have uniformly held that it fashioned a new federal remedy against a particular kind of unfair competition that common law had effectively protected. *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (CA5 1974); *Norman M. Morris Corp. v. Weinstein*, 466 F.2d 137, 141 (CA5 1972).

The purpose underlying the enactment of the section was to make actionable the deceptive use of false designations of origin. *Scotch Whisky Assn. v. Barton Distilling Co.*, 489 F.2d 809, 813 (CA7 1973).

 To recover for a violation of this section it is not necessary that a mark or trade-mark be registered. *National Lampoon, Inc. v. American Broadcasting Co., Inc.*, 376 F.Supp. 733, 747 (S.D.N.Y.1974), aff'd. 2 Cir., 497 F.2d 1343. The dispositive question is whether the party has a reasonable interest to be protected against false advertising. *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 160 (CA1 1977).

The term "mark" is defined in 15 U.S.C. § 1127 as follows:

"The term 'mark' includes any trade-mark, service mark, collective mark, or

---

1. Part 6 is titled: Classification of Goods and Services under the Trademark Act.

certification mark entitled to registration under this chapter *whether registered or not."* [Emphasis supplied.]

The terms "trade-mark" and "trade name" are defined in 15 U.S.C. § 1127 as follows:

"The term 'trade-mark' includes any word, name, symbol, or device or any combination thereof *adopted and used* by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." [Emphasis supplied.]

"The terms 'trade name' and 'commercial name' include individual names and surnames, firm names and trade names *used* by manufacturers, industrialists, merchants, agriculturists, and others to identify their businesses, vocations, or occupations; . . ." [Emphasis supplied.]

Section 1127 defines the term "use"

"For the purposes of this chapter a mark shall be deemed to be *used in commerce* (a) on goods when it is placed in any manner on the goods or their containers or *the displays associated therewith* or on the tags or labels affixed thereto and the goods are sold *or transported in commerce* and (b) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in this and a foreign country and the person rendering the services is engaged in commerce in connection therewith." [Emphasis supplied.]

Also expressed in 15 U.S.C. § 1127 is the intent of Congress in passing the legislation.

"The intent of this chapter is to regulate commerce within the control of Congress *by making actionable the deceptive and misleading use of marks in such com-*

*merce*; to protect registered marks used in such commerce from interference by State, or territorial legislation; *to protect persons engaged in such commerce against unfair competition*; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies . . ." [Emphasis supplied.]

For the purposes of the chapter on trademarks, including § 1125(a), a mark is deemed to be "used in commerce" on goods when it is placed in any manner on the displays associated with the goods and the goods are sold or transported in commerce. 15 U.S.C. § 1127. We hold that the appellee's mark was placed on the displays associated with its proposed publication. The displays consist of the 430,000 solicitations mailed to perspective customers in California with the "New West" logo prominently displayed inside and out, the mock-up issue mailed to advertisers in California and Connecticut and other such mailings and advertising on which the "New West" logo was placed.[2] Here, as mentioned at the outset, there is no question but that the goods were "transported in [Interstate] commerce" as defined by 15 U.S.C. § 1127.

The recent New York district court decision, *George Washington Mint, Inc. v. Washington Mint, Inc.*, 349 F.Supp. 255 (S.D.N.Y.1972), is highly supportive of our holding that appellee established a prior use of the mark without an actual sale of the magazine with the mark affixed thereto. In *Washington Mint*, the defendant was found to have first shipped goods with its "Washington Mint" mark affixed on March 1, 1972. Plaintiff was found to have first shipped goods with its "Geo. Washington Mint" mark affixed on March 29, 1972. Despite prior affixation by defendant, plaintiff was held to have made out a prior

---

**2.** *See, Hotel Corporation of America v. Inn America, Inc.*, 153 U.S.P.Q. 574, 576 (1967); *International Tel. & Tel. Corp. v. General Instr. Corp.*, 152 U.S.P.Q. 821, 824 (1967); *Phoenix Products Co. v. Mystik Tape, Inc.*, 149 U.S.P.Q. 702 (1966). Though not interpreting the 15 U.S.C. § 1127 definition of "used in commerce", these cases support the theory that prior use of a trade-mark can be established by affixation of the mark to advertising, promotional and sales subscription materials.

"trademark use" of its mark by reason of its earlier sales efforts. The court there stated:

> "The plaintiff has established that its first use of the trademark on its goods was on March 29, 1972. Its first use of 'The Geo. Washington Mint' in both interstate and intrastate commerce was on December 20, 1971. The initial sales effort began in September 1971. Two hundred plates were ordered from the plaintiff through its sales agent on December 22, 1971. At that time the plaintiff had twenty sample plates on hand which it used for display purposes. By January 31, 1972 the plaintiff had received orders for approximately 18,000 Whistler plates and orders for 14,000 Wyeth plates. The orders came from 192 dealers.

> "All this makes out a use by the plaintiff of its mark for the purpose of determining priority. 3 Callman, Unfair Competition, § 76.1 (3d ed. 1968). *Actual sale is not necessary. New England Duplicating Co. Inc. v. Mendes,* 190 F.2d 415, 417 (1 Cir. 1951); 3 Callman, *supra* § 76.2(d) at 288. *Here the taking of orders made contracts of sale and the use of 'The Geo. Washington Mint' was an integral part of the process of sale."* [Emphasis supplied.] 349 F.Supp. at 260.

The First Circuit in *Mendes, supra,* interpreted the definition of "used in commerce" under § 1127 and held:

> "It seems to us that although evidence of sales is highly persuasive, the question of use adequate to establish appropriation remains one to be decided on the facts of each case, and that evidence showing, first, adoption, and, second, *use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark,* is competent to establish ownership, even without evidence of actual sales." [Emphasis supplied.] 190 F.2d 415 at 418.

Similarly, in *Hotel Corp. of America v. Inn America, Inc., supra, fn.* 2, the court held that a party may acquire rights in a designation which may be superior to any rights that a subsequent user may acquire in a confusingly similar term through use thereof in advertising or promotional material connected with the publicizing and/or offering for sale of goods or services, providing that this use has been of such nature and extent as to create an association of the goods or services and the mark with the user thereof.

■ Under the holding of *Washington Mint, Mendes,* and their progeny, the totality of appellee's acts prior to February 5, 1976, shows: (1) adoption of the "New West" mark; and (2) "use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind" as those of appellee NYM. Although mere advertising by itself may not establish priority of use, *Consumers Petroleum Co. v. Consumers Co. of Illinois,* 169 F.2d 153 (CA7 1948), *cert. denied* 335 U.S. 902, 69 S.Ct. 406, 93 L.Ed. 437 (1949); *Deltronics, Inc. v. H. L. Dalis, Inc.,* 158 U.S.P.Q. 475 (1968), the totality of appellee's prior actions, taken together, establish a right to use the trade-mark and trade name "New West." 430,000 individuals received a subscription mailing which contained the "New West" mark on exemplar covers of appellee's new magazine. Countless others saw the "New West" supplement in the February 23, 1976, issue of New York magazine with the mark prominently displayed thereon. Over 13,500 people subscribed to appellee's "New West" magazine prior to the printing of appellant's preview edition. These promotions coupled with advertiser and distributor solicitations unquestionably meet the *Mendes* "public identification" requirement, and fall squarely under the holding in *George Washington Mint.*

Appellant has produced no factual dispute relevant to this issue. It merely argues that the district court erred as a matter of law in finding appellee's actions to have constituted a prior use of the mark and consequently entitled to protection. We hold that no material factual issue was presented and that the district court properly found that the right to use the trademark and trade name "New West" was

with the appellee due to its prior "use" of the mark in interstate commerce.

## II.

Appellant does not challenge the district court's conclusions that it infringed upon and unfairly competed with appellee in connection with the use of the mark. It challenges only appellee's ownership of the mark. However, having now decided that appellee had the ownership of and legal right to use the trade-mark and trade name "New West", it is appropriate that we outline our reasons for supporting the district court on these conclusions.

■ The courts have uniformly held that common law and statutory trade-mark infringements are merely specific aspects of unfair competition. *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 461 (CA3 1968), *cert. denied* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270; *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627, 632 (CA7 1968), *cert. denied* 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386; *Heaton Distributing Co. v. Union Tank Car Co.*, 387 F.2d 477, 483 (CA8 1967).

■ Trade name infringement also is part of the larger tort of unfair competition, and it is based on considerations similar to trade-mark infringement. *Waples-Platter Companies v. General Foods Corp.*, 439 F.Supp. 551, 584 (N.D.Tex.1977). A trade name is descriptive of the manufacturer or dealer himself and applies to a business and its good will, whereas a trade-mark, in a technical sense, is applicable to the vendible commodities.

■ Trade-mark and trade name infringement, or unfair competition, preclude one from using another's distinctive mark or name if it will cause a likelihood of confusion or deception as to the origin of the goods. *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (CA7 1976); *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., supra*, at 463;

*Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 668 (CA2 1968).

Similarly, under the Lanham Act, 15 U.S.C. § 1125(a),[3] the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc., supra; Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (CA9 1968); *Hesmer Foods, Inc. v. Campbell Soup Co.*, 346 F.2d 356, 359 (CA7 1965), *cert. denied* 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 81. Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a "likelihood of confusion?"

■ The Ninth Circuit has defined the elements to be considered in deciding whether there is a "likelihood of confusion." In *J. B. Williams Co., Inc. v. LeConté Cosmetics, Inc.*, 523 F.2d 187 (CA9 1975), *cert. denied* 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976), the court stated:

". . . [T]he court must consider numerous factors, including *inter alia* the strength or weakness of the marks, similarity in appearance, sound, and meaning, the class of goods in question, the marketing channels, evidence of actual confusion, and evidence of the intention of defendant in selecting and using the alleged infringing name." 523 F.2d at 191.

Neither actual confusion nor intent are necessary to a finding of *likelihood* of confusion under the Lanham Act. *J. B. Williams Co., Inc. v. LeConté Cosmetics, Inc., supra*, at 191, fns. 5, 6; *Doran v. Sunset House Distributing Corp.*, 197 F.Supp. 940, 948 (S.D.Cal.1961), *aff'd*. 304 F.2d 251 (CA9 1962); McCarthy, *Trademarks and Unfair Competition*, § 23:30(B) (1973).

The court in *J. B. Williams, supra*, also defined the words "strong" and "weak." "A 'strong' mark is one which is used only in a 'fictitious, arbitrary and fanciful manner', *see National Lead Co. v. Wolfe*, 223 F.2d 195, 199 (9th Cir. 1955), whereas a 'weak' mark is a mark that is a meaningful word in common usage, *see Sunbeam Lighting Co. v. Sunbeam Corp.*, 183

3. See page 1198, supra.

F.2d 969, 972–973 (9th Cir. 1950), or is merely a suggestive or descriptive trademark, *see Majestic Mfg. Co. v. Majestic Electric Appliance Co., Inc.*, 172 F.2d 862 (6th Cir. 1949). A 'strong' mark is entitled to a greater degree of protection than is a 'weak' one because of its unique usage, *see Stork Restaurant v. Sahati*, 166 F.2d 348, 355 (9th Cir. 1948)." 523 F.2d at 192.

The name "New West" does not describe the contents of the magazine nor does the name suggest the type of product involved. *See Modular Cinemas of America, Inc. v. Mini Cinemas Corp.*, 348 F.Supp. 578 (S.D. N.Y.1972); *Stix Products, Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479 (S.D.N.Y.1968). Nor is the name "primarily geographically descriptive" as defined by the cases interpreting § 2 of the Lanham Act, 15 U.S.C. § 1052(e)(2).[4]

However, even if "New West" is found to be a "weak" mark, this is only one factor to be considered along with several others in determining "likelihood of confusion." McCarthy, supra at § 11:24, analyzed the various protections courts have given "strong" and "weak" marks and stated: "Strong marks are given 'strong' protection—protection over a wide range of related products and variations on appearance of the mark. Weak marks are given a narrow range of protection both as to products and as to visual variations." *See Family Circle, Inc. v. Family Circle Associates, Inc.*, 332 F.2d 534 (CA3 1964). Therefore, under the facts presented here, appellee is entitled to protection even if its mark is "weak" due to the obvious similarities of the marks in appearance (See Appendix A) and sound, along with the virtually identical product and market distribution area. In light of the strength of these factors, it is clear that

a reasonable consumer of average intelligence and experience would be confused as to the source of these magazines. Identical names, products and area of distribution compel such a conclusion.

■ Therefore, in weighing all of the elements necessary to a determination of "likelihood of confusion", appellee is entitled to protection of its mark since appellant's use under the undisputed facts presented here creates a false designation of origin and, therefore, unfairly competes with appellee in violation of § 1125. The district court did not err in concluding that appellant's acts were likely to cause confusion, infringed upon appellee's trade-mark and trade name "New West", and unfairly competed with appellee in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

### III.

The Ninth Circuit has ruled that attorney fees are not recoverable in trade-mark infringement cases under the Lanham Act. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 359 F.2d 156 (CA9 *In Banc* 1966), aff'd. 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).

■ California state law allows recovery of attorney's fees in unfair competition areas. West Ann.Cal.Bus. & Prof.Code, § 17082.[5] However, two Ninth Circuit cases have limited the kind of cases to which § 17082 can be applied. *See HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 721 (CA9 1974); *Pachmayr Gun Works, Inc. v. Olin Mathieson Chem. Corp.*, 502 F.2d 802, 809–813 (CA9 1974). *Pachmayr* interpreted the "chapter" referred to in § 17082 as that dealing with price discrimination, secret rebates and "loss selling" under the Unfair

---

4. § 1052(e)(2) states that a mark will not be refused registration unless it consists of a mark which: "When applied to the goods of the applicant is *primarily geographically descriptive* or deceptively misdescriptive of them, . . . ." [Emphasis supplied.] An exhaustive listing of marks held to be "primarily geographically descriptive" is contained in McCarthy,

supra at § 14:2. "New West" is not descriptive of any particular location of the magazine.

5. § 17082.
 "In any action *under this chapter* in which judgment is entered against the defendant the plaintiff shall be awarded a reasonable attorney's fee together with the cost of the suit." [Emphasis supplied.]

Practices Act, §§ 17040–17051. None of the violations set forth there have been violated here. Therefore, even if we applied California state law on the subject, it was error for the district court to allow attorney fees under any of the theories of this case.

## CONCLUSION

We hold the viewing the undisputed evidence and the inferences which may be drawn therefrom in the light most favorable to the appellant, the appellee was clearly entitled to prevail as a matter of law. *British Airways Board v. Boeing Co.,* 585 F.2d 946, 950–951 (CA9 1978). The judgment of the district court is affirmed as modified by elimination of attorney fees. The cause is returned to the district court for such further proceedings as may seem meet and proper in the premises.

IT IS SO ORDERED.

## APPENDIX A