# MARYLAND STADIUM AUTHORITY

v.

## Roy G. BECKER.

### Civ. No. JFM-91-2735.

United States District Court, D. Maryland.

Nov. 12, 1992.

---

Jerrold A. Thrope, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., for plaintiff.

Ruth Mae Finch, Baltimore, Md., for defendant.

## OPINION

MOTZ, District Judge.

■ The Maryland Stadium Authority ("MSA") has brought this action against Roy G. Becker, asserting claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for unfair competition under Maryland common law. MSA, the owner of the baseball park in which the Baltimore Orioles play, alleges that Becker has wrongfully used the mark "Camden Yards" in connection with the sale of tee shirts and several other items of clothing. Discovery has been completed, and the parties have filed cross-motions for summary judgment.[1]

---

**1.** Becker contends that this Court lacks subject matter jurisdiction because MSA has not alleged that his infringement occurred in interstate commerce. There are two fallacies in this argument. First, this action is brought under Section 43(a) of the Lanham Act and that section (unlike Section 32(1) of the Act) does not require a defendant to have engaged in interstate commerce. *See Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 839 (11th Cir. 1983). Second, Becker admitted on deposition that he sold tee shirts in Virginia, Pennsylvania and Maryland and directly to consumers in California, Florida and Canada.

Becker also argues that jurisdiction is lacking because MSA has not sold goods in interstate commerce. This argument too misses the plate. Promotion and advertising in interstate commerce is sufficient to confer jurisdiction under Section 43(a), *see, e.g., New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1199 (9th Cir.1976); *Jellibeans, Inc.,* 716 F.2d at 838, and the record fully establishes that MSA promoted and advertised the Camden Yards sports com-

## I.

MSA is a public corporation created in 1986 by the Maryland General Assembly to plan, build and operate a sports complex, including a baseball park and, possibly, a football stadium (in the event that Baltimore is again awarded a franchise by the National Football League). Md.Fin.Inst. Code Ann., § 13–702 (1992 Supp.). In 1987 the General Assembly approved MSA's recommendation that the sports complex be constructed at Camden Yards, an area which for over a century had been a center of operations for the Baltimore & Ohio Railroad in downtown Baltimore.

In 1989 demolition of old buildings at the site commenced, and in early 1991 the superstructure of the new park began to rise from the ground. The park was scheduled to be completed for the start of the 1992 season, and throughout the summer of 1991, as public excitement grew, there was extensive public debate as to what it should be called. The two names most prominently mentioned were "Camden Yards" and "Oriole Park." In October 1991 the debate ended in compromise with the announcement that the name "Oriole Park at Camden Yards" had been chosen.

Construction proceeded apace during the long winter months, and on a cold but glorious afternoon in early April, 1992, the park was first opened for an exhibition game between the Baltimore Orioles and the New York Mets (a team last seen, unhappily, in Baltimore in the 1969 World Series). The following day the Orioles' official season began with a game against the Cleveland Indians (who, even more unhappily, had beaten the Orioles 19 out of 21 times in 1954 when Memorial Stadium, the Birds' former park, had been opened).

In the meantime, in July 1991, Becker had begun selling tee shirts outside Memorial Stadium. These tee shirts bore the lettering "Camden Yards means baseball," "Baltimore, Maryland," and "1992," and displayed a design including an oriole, crossed baseball bats and a baseball diamond. Becker continued his street vendoring until the last day of the 1991 baseball season. He also sold his shirts by direct mail, through sports bars and stores, and by advertising in a local publication known as the "Penny Saver."

On August 22, 1991, MSA wrote to Becker demanding that he cease use of the name Camden Yards. Becker did not respond to the letter, and MSA filed this suit on September 23, 1991.

## II.

Section 43(a) of the 1947 Lanham Act creates a federal claim for unfair competition by prohibiting the use in interstate commerce of any "false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same...." 15 U.S.C. § 1125(a) (1988). This provision protects against trademark, service mark, trade dress and trade name infringement even though the mark or name in question has not been federally registered. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).[2]

The two basic elements necessary to establish infringement of an unregistered mark are "(1) the adoption and use of a mark and [the] entitlement to enforce it, and (2) the adoption and use by a junior user of a mark that is likely to cause confusion that goods or services emanate from the senior owner." *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F.Supp. 198, 209 (D.Md.1988); *see also Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 992–93 (2d Cir.1987). Thus, "[t]he gist of a

---

plex in several states. Moreover, baseball fans have come to the field at Camden Yards from afar, across state and national borders, in pursuit of their dreams. Occasionally, courtly bird watchers from the Carolinas and Virginias can be spotted in the stands.

**2.** For purposes of this case, distinctions between the types of marks are irrelevant. *See Accuride*

*Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534–35 (9th Cir.1989) ("As a practical matter, courts are rarely called upon to distinguish between trade names, trademarks, and service marks."); *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 604 (9th Cir.1987) (identical standards govern trademark and service mark infringements).

claim for trademark infringement ... is a sanction against one who trades by confusion on the goodwill or reputation of another, whether by intention or not." *Perini,* 915 F.2d at 124 (quoting *Quality Inns Int'l, Inc.,* 695 F.Supp. at 209).

■ "Word marks" are classified into four categories: generic, descriptive, suggestive, and arbitrary or fanciful. *Perini,* 915 F.2d at 124. Geographic locations are considered descriptive word marks.[3] *See American Waltham Watch Co. v. United States Watch Co.,* 173 Mass. 85, 53 N.E. 141 (1899) (Holmes, J.). To obtain trademark rights in a descriptive word mark and satisfy the first element of infringement, MSA must prove that: (a) it adopted and used the mark, and (b) the mark acquired secondary meaning. *Perini,* 915 F.2d at 125.[4]

### III.

■ As a threshold matter, Becker argues that MSA's use of the name Camden Yards as the name of the sports complex was insufficient to create trademark rights prior to July 1991 because MSA had not sold goods or services with the Camden Yards mark by that time. The argument is without merit. Although the sale or shipment of goods in commerce is necessary as part of a valid trademark application, *see In re Cedar Point, Inc.,* 220 U.S.P.Q. 533, 535–36 (TTAB 1983), the sale of goods or services using an unregistered mark is not necessary to establish use of the mark. *See New England Duplicating Co. v. Mendes,* 190 F.2d 415, 418 (1st Cir.1951). Advertising and promotion is sufficient to obtain rights in a mark as long as they occur "within a commercially reasonable time prior to the actual rendition of service ...," *Kinark Corp. v. Camelot, Inc.,* 548 F.Supp. 429, 442 (D.N.J.1982), and as long

as the totality of acts "create[s] association of the goods or services and the mark with the user thereof." *New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1200 (9th Cir.1979) (citing *Hotel Corp. of America v. Inn America, Inc.,* 153 U.S.P.Q. (BNA) 574, 576 (1967)); *see also Selfway, Inc. v. Travelers Petroleum, Inc.,* 579 F.2d 75, 79 (C.C.P.A.1978). Therefore, the questions which must be resolved are (1) whether MSA had adopted and used the Camden Yards mark prior to July, 1991, (2) whether the mark had obtained secondary meaning and (3) whether Becker's use of the mark creates a likelihood of confusion. As will be seen, the latter two questions merge.

### A. Adoption and Use of the Mark

■ The name Camden Yards first became associated with the proposed sports complex in 1987 when the Maryland General Assembly approved MSA's recommendation that the complex be constructed at the location of B & O's former railroad yard in Baltimore City. The General Assembly specifically defined the site as "85 acres in Baltimore City in the area bounded by Camden Street on the north, Russell Street on the west, Osten Street on the south, and Howard Street and Interstate 395 on the east." Md.Fin.Inst.Code Ann. § 13–709(f) (1992 Supp.).

MSA, itself, has referred to the project as the Camden Yards sports complex for many years. In November 1988 it formulated a "Camden Yards Sports Complex Development Plan" for "a major professional sports complex accommodating both a baseball park and a football stadium in the area of Camden Yards." This plan was disseminated to both the public and the press. Beginning in July 1989, MSA published a bi-monthly baseball newsletter that contained such phrases as "ball park at

---

3. MSA contends that Camden Yards is not a geographically descriptive mark on the ground that Camden Yards is a specific location which it now exclusively owns and at which only one service is provided. *See* 1 J.T. Mccarthy, *Trademarks and Unfair Competition,* 14:1 at 621 (2d ed. 1984). I need not decide this issue in light of my ruling that the name has acquired a secondary meaning.

4. MSA's claim for the state common law tort of unfair competition parallels its trademark infringement claim in all substantial respects. *See, e.g., Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F.Supp. 198, 209 (D.Md.1988).

Camden Yards," "Camden Yards site," and "Camden Yards Industrial area." The newsletter (as well as other brochures and pamphlets making reference to Camden Yards) was distributed to the press, to 2,500 readers and to members of the public who made inquiries about the new sports complex. Beginning in September 1989, MSA distributed to the press and sold to the public photographic renditions of the sports complex and baseball park, entitling them "Camden Yards Sports Complex" or "Camden Yards Ball Park." It also published drawings entitled "Camden Yards stadium properties" depicting the area where the sports complex was to be built. Likewise, its 1990 annual report, distributed to the Governor's office, members of the Maryland General Assembly, the news media and the Pratt Library, specifically referred to the Camden Yards sports complex.

MSA held a number of promotional events at Camden Yards which included media briefings and photo opportunities. At the "Wrecking Ball" and "Grand Slam" in June and November 1989, over 4,000 members of the public watched the demolition of various buildings which had been standing in the Camden Yards area. In February 1990, Pete Harnisch, Elrod Hendricks and Randy Milligan came to pitch, catch and hit the first balls thrown over the actual location of home plate at the new stadium. In April 1990, MSA began conducting regular tours of the Camden Yards sports complex. The name Camden Yards was used in publicizing all of these events.

MSA also generated public interest in the historical qualities of Camden Yards. In January 1990, it sponsored an "Archeological Open House" during which 1,000 people toured the location of the saloon once managed by George Herman Ruth, Sr., father of Babe Ruth. On March 27 and 28, 1990, it sponsored "Student Press Days" in which 200 middle and high school students studied the archeology of the area. It prepared a pamphlet detailing Camden Yards' archeological significance and distributed it to the Governor's Office, to the General Assembly, at locations visited by a mobile publicity van, to the Babe Ruth Museum

and to members of the public who asked about the complex. MSA even designed a continuing education course, given at the University of Maryland, Baltimore County, entitled "The Camden Yards Ballpark—Baltimore's New Stadium," which covered various aspects of the sports complex, including the area's history and archeology.

Baltimore's 1991 baseball season was a remarkable one. While the team's performance on the field was rather dismal, attendance figures soared. Nostalgic and sentimental by nature, Oriole fans flocked to old Memorial Stadium to see a baseball game there just one more time. On the final day of the season, poignant closing ceremonies were held during which waves of Orioles from different eras streamed onto the field to say goodbye to the old ballpark on 33rd Street. But just as those ceremonies dramatically culminated in digging up home plate, transporting it by limousine and placing it at its new downtown home, so too throughout Memorial Stadium's last baseball season talk about the new ballpark had constantly been in the air. It represented the hope of the future and was on the mind and in the heart of every true Oriole fan. What would it be called? Oriole Park or Camden Yards? Controversy raged, from bar room to living room, from State House to penthouse. When it appeared that perhaps an impasse had been reached, such bland alternatives as "Harbor Stadium" crept into discussion. But one thing was certain: by the summer of 1991, whatever the official name of the ballpark might end up to be, Camden Yards had, as Becker's own tee shirts proclaimed, come to "mean baseball."

In short, at the time that Becker started his business, MSA's promotional efforts had already borne fruit. For any reasonable person to have made any association other than baseball with the Camden Yards name would have been as unlikely as Boog Powell hitting an inside-the-park home run, Paul Blair playing too deep, Brooks Robinson dropping a pop-up, Frank Robinson not running out a ground ball, Jim Palmer giving up a grand slam home run, Don Stanhouse pitching an easy 1-2-3 inning, or Cal

Ripken, Jr., missing a game because of a cold. It is of such stuff that summary judgment is made. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## B. *Secondary Meaning*

■ In addition to proving its use of the Camden Yards mark, MSA also must establish that the mark has a secondary meaning. "Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify. For example, the descriptive phrase 'quick stop' used to describe convenience stores would only acquire secondary meaning if a substantial portion of the consuming public were to associate the term with a particular business." *Perini*, 915 F.2d at 125. Plaintiff has the burden to show secondary meaning (1) in the defendant's trade area, and (2) prior to the time the defendant entered the market. *Id.* at 125–26.

As I have already noted in discussing the adoption and use question, the factual record establishes beyond dispute that by July 1991 MSA's promotional efforts and the media coverage given to the new baseball park had conferred a secondary meaning upon the name Camden Yards. *See generally Perini*, 915 F.2d at 125. But if any doubt were to exist on the issue, it is dispelled by the fact that Becker intentionally copied the Camden Yards mark. Everything surrounding his use of the mark was baseball related. His tee shirts made reference to baseball in Baltimore and had baseball bats, a baseball diamond and an oriole on them. He sold the shirts outside of Memorial Stadium to baseball fans. He conducted his business under the name "Camden Yards Stadium." Under Fourth Circuit law this evidence of intentional direct copying "establishes a *prima facie* case of secondary meaning sufficient to shift the burden or persuasion to the defendant on that issue." *See Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917

F.2d 161, 163 (4th Cir.1990) (quoting *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 448 (4th Cir.1986)). Becker has presented absolutely no evidence which would meet this burden.

## C. *Likelihood of Confusion*

■ The only remaining issue is whether Becker's use of the Camden Yards mark is likely to cause confusion that such goods were in fact produced by MSA. *See Perini*, 915 F.2d at 127. In order for likelihood of confusion to exist, it is not necessary that the public know that MSA is the owner of the mark. All that needs to be shown is that the public knew that the clothing in issue likely would have come from a single source. *See M. Kramer Mfg. Co.*, 783 F.2d at 449. Further, "[t]he test is not only the danger that defendant's use of the [trademarks] will confuse plaintiff's customers, but the likelihood of danger that such use will confuse the public in general, including plaintiff's customers, defendant's customers and other members of the public." *AMP Inc. v. Foy*, 540 F.2d 1181, 1183 (4th Cir.1976).

■ Intentional copying of a mark raises a presumption of likelihood of confusion just as it raises a presumption of secondary meaning. *See Osem Food Indus. Ltd.*, 917 F.2d at 165; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 9 U.S.P.Q.2d (BNA) 1690, 1699 (1st Cir.1989). Again, Becker has presented absolutely no evidence to overcome this presumption. And again, the presumption aside, the undisputed evidence establishes that the baseball related designs which Becker placed upon his tee shirts entitles MSA to summary judgment on the likelihood of confusion issue. *See generally Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1023 (11th Cir.1989); *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 9 U.S.P.Q.2d (BNA), at 1697.

A separate order effecting the rulings made in this opinion is being entered herewith.

## ORDER

For the reasons stated in the opinion entered herein, it is this 12th day of November 1992

ORDERED

1. Plaintiff's motion for partial summary judgment is granted;

2. Defendant's motion for summary judgment is denied; and

3. Defendant is permanently enjoined from using the name "Camden Yards" on any tee-shirts, hats, sweat shirts or other items of clothing which he manufacturers, distributes or sells or in connection with advertising or promoting the distribution or sale of such products; and

4. A conference will be scheduled with counsel for the purpose of setting a hearing on plaintiff's claim for monetary damages.