768 F.2d 1001
 82 A.L.R.Fed. 97, 225 U.S.P.Q. 458,
227 U.S.P.Q. 598,
1985 Copr.L.Dec. P 25,836
 TRANSGO, INC., Plaintiff-Appellee/Cross-Appellant,
v.
AJAC TRANSMISSION PARTS CORP., Fairbanks Racing Automatics,
and Jerry Jacoby, Defendants-Cross-Appellants/Appellees,
and
Fairbanks America, Inc., and Joseph P. Lupo, Defendants-Appellees.
 Nos. 80-5659 to 80-5661, 80-5707, 81-5102, 81-5230 to
81-5232, 81-5691, 82-5161 and 82-5162.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 9, 1984.
Decided Jan. 15, 1985.
As Amended on Denial of Rehearing
and Rehearing En Banc
Aug. 15, 1985.
 
 John E. Kelly, Woodland Hills, Cal., for plaintiff-appellee, cross-appellant.
 James W. Geriak, William L. Respess, Lyon & Lyon, Los Angeles, Cal., for defendants-cross-appellants, appellees.
 Gene S. Winter, St. Onge, Steward, Johnston & Reens, Stamford, Conn., for defendant-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE and ALARCON, Circuit Judges, and HARDY,* District Judge.
 ALARCON, Circuit Judge:
 
 
 1
 Ajac Transmission Parts Corp. (Ajac), Jerry Jacoby (Jacoby), and Fairbanks Racing Automatics (Fairbanks) appeal from (1) the judgment entered against them after trial by jury for copyright and trademark infringement, unfair competition, false designation of origin and conspiracy, (2) the award of attorney's fees, (3) the denial of their post-trial motions and (4) separate orders of the district court finding them in contempt. Transgo, Inc., (Transgo) has cross-appealed from (1) the judgment entered in favor of appellants on the claim that Fairbanks violated Transgo's trade dress rights by copying its color codes for springs and its instruction sheets and by engaging in false advertising and (2) from the order of the district court imposing sanctions against Fairbanks and its president. We affirm.
 
 
 2
 * A. FACTUAL BACKGROUND
 
 
 3
 In order that the parties' legal contentions can be more readily understood, we set forth the facts in some detail. In doing so, we have resolved conflicts in the evidence in favor of the party who prevailed on a particular claim.
 
 
 4
 1. Evolution of Transgo's "Shift Kit"
 
 
 5
 Gilbert Younger (Younger) began working with automatic transmissions in 1951 as a mechanic for a Ford dealership. In 1956, he acquired his own automatic transmission rebuilding shop.
 
 
 6
 Around 1961, Younger invented two different valve body kits for the Ford 2-speed automatic transmission and began manufacturing them the next year. He called his products Valve Body Repair Kits, Valve Body Rebuilding Kits, or Valve Body Calibration Kits. He did not obtain a patent for his inventions.
 
 
 7
 Transmission rebuilders regard the valve body as the "brain" of an automatic transmission. Countervailing pressures are created in the valve body when springs on the one hand, and hydraulic fluid coming through a separator plate on the other, exert their forces on pistons. These pressures determine the transmission's shifting characteristics. Automatic transmission manufacturers strive for a smooth shift, so that passengers will not feel the gears' movements. A firmer shift, however, can improve car performance. The shift can be altered by replacing the springs and separator plate installed by the manufacturer with one of Younger's valve body kits.
 
 
 8
 Younger developed a reputation as an expert in the transmission trade. Among transmission rebuilders, he was known as "Mr. Shift." He was invited to lecture to other rebuilders at seminars sponsored in different parts of the country by the Automatic Transmission Rebuilders Association, the Automobile Parts Rebuilders Association, and the Automotive Service Counsel. He used the lectures to attempt to create a demand and a market for his valve body kits.
 
 
 9
 He would also gather information at these meetings concerning rebuilders' problems with different types of automatic transmissions. When he was not lecturing, Younger gathered information concerning transmission problems by telephone. Transgo's instruction sheets contained the telephone number of its research division. Rebuilders were invited to telephone for assistance with any transmission problem. Younger and his staff developed a line of valve body kits to solve problems with different types of automatic transmissions. By 1976, the line had grown from two to twenty-four. A Transgo valve body kit generally consists of a separator plate, discretely colored springs, check valves, gaskets, and an instruction sheet.
 
 
 10
 The valve body kit for each type of transmission was arbitrarily assigned a set of identifying numbers or letters. For example, the kit for a "Torque-Flight" transmission was identified as "TF." Kits would be marketed under a product designation consisting of "SK" for "Shift Kit" and the identifying letters. Thus, a valve body kit to improve Torque-Flight transmissions was given the product model designation "SK-TF."
 
 
 11
 Along with developing valve body kits, Younger's group developed instruction sheets to guide rebuilders in the installation of replacement parts. The development of some instruction sheets took as much time as did the development of the parts themselves. The first instruction sheets used photographs from factory manuals or factory charts of the particular transmission the kit was designed to improve. Later, Younger did his own camera work. Younger's picture appeared on the instruction sheets.
 
 
 12
 About 1966, Younger decided to capitalize on his reputation by associating his nickname, Mr. Shift, with his valve body kits, and he began referring to them as "shift kits" in conversations with customers. In 1969, he began placing the name "Shift Kit" on the packages for his products.
 
 
 13
 In the transmission trade, distributors buy valve body kits in bulk and repack them in packagings that simulate the packagings used by the original equipment manufacturers. This is done so that transmission rebuilders can organize their shelves by putting all the products for a certain transmission model together. Distributors generally do not display the product manufacturer's name on the package in order to prevent rebuilders from ordering directly from the manufacturer. In accordance with this trade practice, Younger permitted distributors to repackage his valve body kits without displaying his name on their package. He recognized that a distributor had the implied right to use the name shift kit when he purchased the product from Younger.
 
 
 14
 In 1969, Younger developed a line of valve body replacement components called "Reprogramming Kits." These kits were designed for use in high performance engines, hot rodders, drag racers and by car enthusiasts. Reprogramming kits go on the shelves of "speed shops," where a car enthusiast can purchase them for self-installation. A separate division of Transgo manufactures these high performance products. Other manufacturers of comparable kits such as J.C. Whitney and Company and Hurst Performance, were referring to their products as shift kits when Younger's reprogramming kits were introduced to the high performance market.
 
 
 15
 By 1976, Transgo was the sole manufacturer of valve body kits for automatic transmissions of ordinary passenger cars. They were distributed throughout the United States and Canada. Transgo also sold directly to a customer in Australia and several world-wide exporters.
 
 
 16
 Ninety percent of Transgo's sales came from valve body kits. In 1975, the sales of shift kits totalled about $750,000.
 
 
 17
 2. Evolution of the Fairbanks "Shift Kit"
 
 
 18
 Ajac was formed in 1966 by Jerry Jacoby, who was its president and sole stockholder. Ajac purchases transmission parts from various manufacturers, repackages them, and sells them under its own name to transmission rebuilders and to other distributors. It has approximately 3,000 accounts world-wide, the majority of which are transmission rebuilders. Most of Ajac's sales result from telephone orders.
 
 
 19
 For ten years after Ajac started doing business in 1966, it sold Transgo valve body replacement kits for passenger cars. During that period, Ajac purchased $200,000 worth of valve body kits from Transgo.
 
 
 20
 Fairbanks, Inc., the parent company of Fairbanks Racing Automatics, had been in the business of producing high performance automatic transmission and replacement components since the mid-1950s. However, it did not manufacture replacement parts for passenger car transmissions. In 1974, several distributors of automatic transmission parts, including Ajac, suggested to Joseph Lupo, the president of Fairbanks, that his company expand into the automatic transmission parts field. To help Lupo make a decision whether his company should get into that field, Jerry Jacoby gave him Transgo's price list, which he had previously treated as confidential, a list of customers for shift kits and information regarding which of Transgo's kits sold best. On several occasions between 1974 and April 1976, Fairbanks purchased sets of Transgo's shift kit line from Ajac. Fairbanks also called the Transgo "hot line" several times to see how Transgo solved problems. Ajac's vice-president asked Lupo to set up a "hot line" which would be available to rebuilders who had questions about Fairbanks' kits or about rebuilding transmissions in general.
 
 
 21
 About October, 1976, Fairbanks began to manufacture and sell a line of valve body kits for passenger cars. The kits displayed the name "Shift Kit" in lettering larger than the lettering used for other words on the boxes. Fairbanks attempted to copy the mechanical components of twenty of Transgo's twenty-four shift kits. The components were packaged in a plastic bag, just as they were in Transgo's kits. Each spring in the Fairbanks' kits had the same color as comparable springs in the Transgo kits. Every one of Fairbanks' product model designations was the same as Transgo's. In one instance, Transgo inadvertently failed to place the numerical portion of the product model designation on the package for the "SK 425" kit. The corresponding Fairbanks' kit also appeared without any model number on the package. The instruction sheets for Fairbanks' "shift kits" were nearly identical in size, shape and page number to the corresponding Transgo instruction sheets. Every photograph and line drawing was taken directly from the Transgo sheets. Younger's picture, however, was omitted. Insignificant changes were made in the introduction and conclusion. As requested by Ajac, Fairbanks installed a "hot line" to receive trouble calls from rebuilders. Fairbanks' employees answered the line "Transactions" and the "Transactions" phone number was printed on Fairbanks' instruction sheets. There was no reference to Fairbanks. The same words used by Transgo to describe the effect of using the kit appeared on Fairbanks' package. The only difference in the package was a tiger stripe motif on the Fairbanks' box.
 
 
 22
 Since Transgo's shift kits were more expensive than Fairbanks' kits, Jacoby planned to replace the Transgo kits with Fairbanks' kits. Ajac sales personnel were not informed of this replacement. The Ajac catalog listed the Fairbanks valve body components under the same numbers that identified Transgo's shift kits. Jacoby recognized that when rebuilders ordered a "shift kit" they assumed they would be getting a Transgo product. Nevertheless, when orders for shift kits came in, Ajac sent Fairbanks kits without any notification to the rebuilder that he was not getting a Transgo product. Ajac charged the same price for Fairbanks' products as for Transgo's.
 
 
 23
 Shortly after Ajac began filling shift kit orders with Fairbanks products, rebuilders began to complain that the product was defective. After receiving numerous complaints, one Ajac salesman telephoned Ajac and inquired whether Transgo had changed its boxes and revised its program. He was informed that this was the case, and he was not told that Ajac was distributing a rival product.
 
 
 24
 Several rebuilders who thought they were buying Transgo kits believed that the boxes bore tiger stripes because Transgo had changed its packaging. When one rebuilder learned that the defective "shift kits" he had purchased were Fairbanks products, Jacoby told him to "just keep my mouth shut, that he would take care of the bill." Jacoby led other rebuilders to believe that they were the only complainants concerning Fairbanks' kits.
 
 
 25
 Fairbanks' new line met with considerable success. In the first three and one-half years following its introduction of the new line of shift kits, it sold an estimated 76,400, and it reaped an estimated $222,000 in profits.
 
 
 26
 3. Facts Pertinent to the Filing of this Action
 
 
 27
 Shortly after Ajac began distributing Fairbanks kits, Transgo began receiving numerous complaints on its hot line from rebuilders about complete failures and transmission "burn-ups." These rebuilders assumed that the shift kits they had purchased from Ajac had been manufactured by Transgo. The copying had been so complete that it took Younger about two months to realize that Ajac was selling kits that were not Transgo products. An Ajac salesman admitted to him that Fairbanks was the manufacturer. After extensive testing of Fairbanks' kits, Transgo sent a notice to the trade in early 1977 entitled "Beware of defective imitation TransCo Shift Kittm products." Younger also asked the Automotive Transmission Rebuilders Association to give notice to the trade since they "had done such things in the past on other defective material" but the association's executive director declined to do so.
 
 
 28
 Transgo applied for trademark registration with both California and the United States early in January 1977, some ten days before filing this action. The California application was granted within a day or two. A United States trademark examiner, however, twice rejected Transgo's application. On August 3, 1978, the examiner indicated that "the mark is highly descriptive, if not generic, and is therefore incapable of acquiring secondary meaning." Transgo appealed the United States Trademark Office's final refusal on February 2, 1979. The outcome of that appeal has been stayed pending the outcome of the instant suit. Transgo also obtained nine United States copyright registrations on its instruction sheets just prior to or after instigation of this action.
 
 
 29
 On January 24, 1977, Transgo commenced this action by filing a complaint which alleged the following misconduct on the part of the appellants:
 
 
 30
 1. Deliberate and willful copying of its trademark "Shift Kit" in violation of 15 U.S.C. Sec. 1125(a).
 
 
 31
 2. Deliberate and willful infringement of its copyright on its trade pieces and instruction sheets in violation of 17 U.S.C. Sec. 106.
 
 
 32
 3. Wrongful appropriation and copying of photographs, pictorial illustrations and trade designations of its goods for competitive use in violation of 15 U.S.C. Sec. 1125(a).
 
 
 33
 4. Wrongful appropriation and copying of plaintiff's package design and product model designations and use of plaintiff's color coding system for purposes of falsely designating the origin of their goods in violation of 15 U.S.C. Sec. 1125(a).
 
 
 34
 After a lengthy and complicated trial, the jury found for Transgo on the following claims for relief:
 
 
 35
 a. trademark infringement relating to the term "Shift Kit,"
 
 
 36
 b. trademark infringement relating to the letters "SK,"
 
 
 37
 c. copyright infringement,
 
 
 38
 d. unfair competition,
 
 
 39
 e. false designation of origin,
 
 
 40
 f. conspiracy to pass off Fairbanks' kits as Transgo products.
 
 
 41
 The jury found against appellants on their counterclaims for unfair competition, disparagement and malicious use and abuse of process. No issue has been raised concerning the sufficiency of the evidence in support of these findings. The jury found against Transgo on its claims for trade dress protection of its uncopyrighted instruction sheets and color coding of its springs. The jury also declined to find that appellants had engaged in false advertising. The jury made specific findings of fact by answering written interrogatories. The court granted Transgo's motion for attorney's fees for the period from December 1976 through the end of litigation.
 
 
 42
 Judgment on the jury's verdict was entered in the district court on May 9, 1980. After timely post-trial motions seeking to set aside the jury's verdict were denied, the court entered final judgment on July 31, 1980, granting a permanent injunction against the appellants, which ordered them to refrain from "using any name, designation, or material ... likely to cause confusion, mistake or deception as to source relative to plaintiff's trademark 'Shift Kit' " and denying all other post-trial motions brought by Ajac, Jacoby and Fairbanks.
 
 
 43
 Notwithstanding this injunction, Fairbanks marketed valve body replacement components under the label "Shift Timing Kit." The court entered a civil contempt order on January 19, 1981, which admonished Fairbanks against using any name containing the words "shift" and "kit," or using the names "Shift Timing Kit," "Posi Shift Kit," "Posi Shift," "2-Stage Kit," and "Posi Shift Single Stage Kit." Fairbanks nevertheless proceeded to market a product which it referred to in a telephone solicitation campaign as "Shift Kit." The district court in two separate proceedings found that Fairbanks had violated the court's final judgment and injunction of July 31, 1980, and the civil contempt order and injunction entered January 19, 1981. The court awarded attorney's fees for the contempt proceedings to Transgo.
 
 B. JURISDICTION
 
 44
 The district court had jurisdiction over the claim of copyright infringement under the United States Copyright Laws, 17 U.S.C. Sec. 101 et seq., 28 U.S.C. Sec. 1338(a) and 28 U.S.C. Sec. 1400(a). Jurisdiction over the trademark infringement claim arose under 28 U.S.C. Sec. 1332 and the Lanham Act, 15 U.S.C. Sec. 1125(a), infringement of an unregistered trademark being a form of false designation of origin, and 28 U.S.C. Sec. 1338(a). The district court had jurisdiction over the unfair competition claim under 28 U.S.C. Sec. 1332 and 28 U.S.C. Sec. 1338(b), and over the claim of false designation of origin under 15 U.S.C. Sec. 1125(a) and 28 U.S.C. Sec. 1338(a).
 
 
 45
 As discussed above, the defendants appeal from the jury verdict, the grant of the injunction, the denial of their post-trial motions, and the award of attorneys' fees. We have jurisdiction over these appeals under 28 U.S.C. Sec. 1291 as they are final decisions of a federal district court. These appeals were timely filed. See Fed.R.App.P. 4(a)(1).
 
 C. STANDARD OF REVIEW
 
 46
 The standard for reviewing a jury verdict is whether it is supported by substantial evidence. Fabrica, Inc. v. El Dorado Corp., 697 F.2d 890 (9th Cir.1983). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). A jury verdict may be reversed if it is clearly erroneous. Marquis v. Chrysler Corp., 577 F.2d 624, 630 (9th Cir.1978). But when there is "sufficient evidence before the jury on a particular issue, and if the instructions of law on the issue were correct, then the jury's verdict must stand." Runge v. Lee, 441 F.2d 579 (9th Cir.1971).
 
 
 47
 Judgment notwithstanding the verdict (JNOV) is proper when the jury verdict is not supported by substantial evidence. William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc., 668 F.2d 1014, 1026 (9th Cir.1981). Denial of JNOV is inappropriate, and therefore must be reversed, when it is clear that the evidence and its inferences cannot reasonably support judgment in favor of the opposing party. Maheu v. Hughes Tool Co., 569 F.2d 459, 464 (9th Cir.1977). Similarly, the grant or denial of either a motion for a new trial or a motion to amend the judgment must be reviewed on the basis of a determination of whether the district court abused its discretion. Inglis & Sons Baking, supra at 1027.
 
 
 48
 It is well settled that an award of attorney's fees under 15 U.S.C. Sec. 1117 is within the discretion of the court. Although attorney's fees are to be awarded "only in exceptional circumstances and on evidence of fraud or bad faith," such awards are reviewable only to determine if the trial court abused its discretion in granting or denying them. See Dogherra v. Safeway Stores, Inc., 679 F.2d 1293, 1298 (9th Cir.1982); Runge, supra; Schmidt v. Zazzara, 544 F.2d 412 (9th Cir.1976).
 
 II
 DISCUSSION
 
 49
 Many issues and sub-issues have been raised by the parties in their appeal of this complex matter. We consider each argument and additional facts pertinent thereto under separate headings. We begin our analysis by addressing the contentions set forth in the briefs filed by Fairbanks, Ajac, and Jacoby.
 
 A. TRADEMARK INFRINGEMENT
 1. "Shift Kit" as a Trademark
 
 50
 In response to special interrogatories, the jury found that "Shift Kit" was not a generic name, but was a descriptive term whose primary significance was to identify Transgo as "the exclusive manufacturing source of the goods to which the name is applied." The jury also determined that the name Shift Kit "when first used by [Transgo] was arbitrary and identified [Transgo] as an exclusive manufacturing source." Finally, the jury concluded that "Shift Kit" was Transgo's trademark.
 
 
 51
 Appellants argue that "Shift Kit" was a common descriptive term which was used generically prior to Transgo's first use.
 
 
 52
 The threshold issue in any action for trademark infringement is whether the words used by a manufacturer in connection with his product are entitled to protection. A potential trademark may be classified as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary. Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 718 F.2d 327, 329 (9th Cir.1983), cert. granted, --- U.S. ----, 104 S.Ct. 1438, 79 L.Ed.2d 760 (1984).
 
 
 53
 We analyze genericness by asking whether a term "has come to be understood as referring to the genus of which the particular product is a species." Anti-Monopoly, Inc. v. General Mills Fun Group, 611 F.2d 296, 302 (9th Cir.1979). Generic terms can never attain trademark protection. Park 'N Fly, at 329. See also 15 U.S.C. Sec. 1052(f). A descriptive term identifies a characteristic or ingredient of an article or service. Id. Descriptive terms ordinarily are not protectable as trademarks. See 15 U.S.C. Sec. 1052(e)(1). They may become valid marks, however, by acquiring a secondary meaning in the minds of the consuming public. Park 'N Fly, at 329; 15 U.S.C. Sec. 1052(f).
 
 
 54
 a. Association
 
 
 55
 To establish that a descriptive term has secondary meaning, the plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938).
 
 
 56
 Secondary meaning is achieved by an association between a name and a source. When this mental recognition occurs among purchasers, the name becomes legally protectable as an identification symbol. American Scientific Chemical, Inc. v. American Hospital Supply Corp., 690 F.2d 791, 792 (9th Cir.1982). "Secondary meaning has been defined as association, nothing more." Carter-Wallace, Inc. v. Proctor & Gamble Co., 434 F.2d 794, 802 (9th Cir.1970). "The test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about the mark in question: does it denote to him 'a single thing coming from a single source?' " Id. (citations omitted).
 
 
 57
 Whether a symbol or device has acquired a secondary meaning is a question of fact. American Scientific Chemical, Inc., supra. Since all factual questions on this issue were resolved by the jury, we must determine whether there is sufficient evidence in the record to support the jury's verdict. We cannot disturb a jury's verdict unless no reasonable person would accept the evidence presented to establish a fact essential to prove liability. Glovatorium, Inc. v. NCR Corp., 684 F.2d 658, 660 (9th Cir.1982). Factors considered in determining whether a secondary meaning has been achieved include: (1) whether actual purchases of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark and, (4) whether use of the claimed trademark has been exclusive. See 1 Gilson, Trademark Protection & Practice, Sec. 2.09.
 
 
 58
 The record is replete with evidence supporting the jury's finding that the relevant market, the rebuilders who used valve body kits, associate the name "Shift Kit" with Transgo. While there was evidence that other manufacturers used the name shift kit to describe valve body components that were manufactured for high performance vehicles used by hot rodders, drag racers and "car enthusiasts," it is clear that these products were sold in a separate market.
 
 
 59
 Furthermore, the parties agreed before the trial that the relevant market consisted of transmission rebuilders. Indeed, on the first day of trial, Fairbanks was successful in preventing the introduction of evidence that Fairbanks had used Transgo's trademark "Reprogramming Kit."
 
 
 60
 Our review of the record satisfies us that a reasonable juror could conclude that there was substantial evidence that the primary significance of "Shift Kit" to rebuilders at all relevant times was to identify Transgo and not the product.
 
 
 61
 b. Likelihood of Confusion
 
 
 62
 Secondary meaning can also be established by evidence of likelihood of confusion. See Norm Thompson Outfitters, Inc. v. General Motors Corp., 448 F.2d 1293, 1297 (9th Cir.1971) (supporting use of "confusion" by Oregon Supreme Court as indicium of secondary meaning). Secondary meaning and likelihood of buyer confusion are separate but related determinations, the relationship rising from the same evidentiary findings. Id. Facts which play a role in the determination of likelihood of confusion in a trademark infringement case include: visual, verbal and intellective similarity; the class of goods in question; evidence of actual confusion; the intent of the defendant; and the strength or weakness of the mark. Carter-Wallace, Inc., 434 F.2d at 800.
 
 
 63
 The products in question here are identical, and the class of goods in question is the same. Furthermore, even if the mark is "weak" (a meaningful word in common usage), that is only one factor to be considered along with the others to determine likelihood of confusion. New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194, 1201-02 (9th Cir.1979). We thus direct our inquiry to the questions of actual confusion and intent of the defendant.
 
 
 64
 (1) Actual Confusion
 
 
 65
 In making its determination that "Shift Kit" had acquired a secondary meaning, the jury could have relied on the confusing similarity of the kits, which caused customers to believe that Fairbanks' faulty kits were those of Transgo.
 
 
 66
 Instances of actual confusion in the mind of the relevant market concerning the Fairbanks product were "stacked high in the record." See North American Aircoach Systems, Inc. v. North American Aviation, Inc., 231 F.2d 205, 213 (9th Cir.1955), cert. denied, 351 U.S. 920, 76 S.Ct. 709, 100 L.Ed. 1452 (1956).
 
 
 67
 (2) Intent of Defendants
 
 
 68
 Proof of exact copying, without any opposing proof, can be sufficient to establish a secondary meaning. Audio Fidelity, Inc. v. High Fidelity Recordings, Inc., 283 F.2d 551, 557 (9th Cir.1960). "There is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." Id. at 558. In another case, we noted that:
 
 
 69
 It is well settled that plaintiffs were not obliged in order to make a case against the defendants to prove a wrongful intent .... But when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.
 
 
 70
 Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 157-58 (9th Cir.1963) (citations omitted).
 
 
 71
 There is no question but that Fairbanks copied the name "Shift Kit." In fact, the record indicates that Fairbanks copied virtually everything with regard to that product. It is clear that Fairbanks attempted to capitalize on the secondary meaning of "Shift Kit" in order to obtain an advantage from the good will built up by Transgo.
 
 
 72
 The other factors indicating secondary meaning considered by the jury were Transgo sales, its duration of exclusive use, and the promotional efforts of Mr. Younger. Transgo sales of products under the "Shift Kit" label were significant; they exceeded $5 million through 1978, see 1 McCarthy, Trademarks and Unfair Competition Sec. 15:10 (1973) (evidence may include number of sales). Prior to Fairbanks' entry into the market in 1976, Transgo exclusively had used the name "Shift Kit" for its products directed to the normal passenger car market for some thirteen years. See American Scientific Chemical, Inc. v. American Hospital Supply Corp., 690 F.2d 791, 793 (9th Cir.1982) (American Scientific's use of its name for over thirteen years was relevant to discussion of secondary meaning). Younger's lectures, shop visits, educational seminars, and the assistance given directly to rebuilders caused them to associate the name "Shift Kit" with Younger and Transgo. As we noted in American Scientific, reliance upon such personal contact, especially in a "market that is specialized, limited and close-knit," is an important element in establishing secondary meaning for a descriptive term. Id.; see also 3 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, Sec. 19.27 (4th ed. 1983).
 
 
 73
 There is substantial evidence to support the jury's finding of secondary meaning in this case.
 
 2. Infringement of Transgo's "SK" Mark
 
 74
 There is also substantial evidence to support the jury's finding that Transgo's SK mark and product numbering system are source indicators and that the defendants infringed them.
 
 
 75
 Almost any symbol can serve as a trademark. American Scientific, 690 F.2d at 792. In Ideal Industries, Inc. v. Gardner Bender, Inc., 612 F.2d 1018 (7th Cir.1979), cert. denied, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980), the Seventh Circuit found that the numerical designation "71B" given to the company's screw-on electrical connectors was protectable. Similarly, the Eighth Circuit in Stewart Paint Mfg. Co. v. United Hardware Distributing Co., 253 F.2d 568, 569-70 (8th Cir.1958), held that the defendant's use of code numbers designating color shades of paint which had been arbitrarily developed by the plaintiff constituted infringement. Also, the Second Circuit held that the designation "V-8," used to identify a juice cocktail drink, was protectable against use by a vitamin manufacturer. Standard Brands, Inc. v. Smidler, 151 F.2d 34, 37 (2nd Cir.1945).
 
 
 76
 Fairbanks admitted copying each of Transgo's part numbers. The SK numbers were used by rebuilders in ordering transmission valve body components from Ajac. A number of rebuilders stated that they always associated the SK numbers with Transgo and Gil Younger.
 
 
 77
 Prior to the use by Fairbanks, only Transgo used SK in its numbering system. During cross-examination, Fairbanks' president agreed that Transgo's numbers were arbitrary and random. He was asked: "If Transgo had called the first designation here PG-XYZ and had been using that for ten years, or six years, would you have copied PG-XYZ?" Lupo responded: "Most likely."
 
 3. Abandonment of Trademark
 
 78
 Ajac contends that even if Transgo at one time had trademark rights in "Shift Kit," those rights have been abandoned due to Transgo's failure to exercise control over the use of the name. Specifically, Ajac points to Transgo's decision to grant an oral license to Winters Performance Products to use "Shift Kit" for products over which Transgo did not exercise quality control. The jury expressly found that Transgo "exercised supervision and control adequate to ensure the quality of those products" in permitting Winters Performance to use the name "Shift Kit" on products.
 
 
 79
 A trade name licensor must maintain control over the quality of the finished product or service to guarantee to the public that the goods or services are of the same, pre-license quality. Siegel v. Chicken Delight, Inc., 448 F.2d 43, 51 (9th Cir.1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). "Because a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof." Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East, 542 F.2d 1053, 1059 (9th Cir.1976), cert. denied, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977).
 
 
 80
 Transgo entered into an oral agreement whereby Winters was permitted to use Transgo's trade name, "Shift Kit," for products sold by Winters under its own label. In approving Winters' use of "Shift Kit," Younger instructed Winters to put "TM" after the term and explained to him that he felt it was a trademark name.
 
 
 81
 At least 90% of the components sold by Winters Performance Products were manufactured by Transgo. On these products, Transgo utilized its own quality control procedures at its plant. Younger cautioned Winters that, if Winters chose to use his own parts, "he [Younger] wanted to know about it." Winters made minor part adjustments on certain Transgo kits after conferring with Younger. Winters designed one product which he called "the 350 Shift Kit." The 350 "Shift Kit" was made from a prototype furnished by Younger. Winters worked with Younger throughout its development. While Younger never directly inspected or tested the final product, he did upon occasion test individual parts of the kit. Due to his association with Winters for over ten years and his respect for his ability and expertise, Younger felt he could rely on Winters to maintain high standards by performing his own quality control. Younger believed that Winters was second only to Younger himself in overall knowledge and ability in product development for this market.
 
 
 82
 Younger's confidence in Winters' ability and integrity was backed by the fact that Transgo never received any complaints from the field about parts produced by Winters Performance Products. See Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 315 F.Supp. 45, 56 (S.D.N.Y.1970) (inspection by a licensor during period of negotiations leading up to agreement constitutes adequate control, particularly where parties are previously familiar with each other's expertise), aff'd, 437 F.2d 566 (2d Cir.1971).[1]
 
 
 83
 "The purpose of the Lanham Act ... is to ensure the integrity of registered trademarks, not to create a federal law of agency." Oberlin v. Marlin American Corp., 596 F.2d 1322, 1327 (7th Cir.1979). The scope of a licensor's duty of supervision of a licensee who has been granted use of a trademark must be commensurate with this limited goal. Id.
 
 
 84
 It is readily apparent from these facts that Transgo did not fail to provide adequate supervision of its licensee. There is substantial evidence to support the jury's determination that the appellants did not meet their burden of proving abandonment.
 
 B. COPYRIGHT
 1. Infringement
 
 85
 The jury found "that the early instruction sheets used by [Fairbanks] were substantially similar to copyrighted material in [Transgo's] nine instruction sheets."
 
 
 86
 "The test of infringement is whether the work is recognized by an ordinary observer as having been taken from the copyrighted source." Bradbury v. Columbia Broadcasting System, Inc., 287 F.2d 478, 485 (9th Cir.), cert. dismissed, 368 U.S. 801, 82 S.Ct. 19, 7 L.Ed.2d 15 (1961). "[T]here must be substantial similarity between the infringing work and the work copyrighted; and that similarity must have been caused by the defendant's having copied the copyright holder's creation." Roth Greeting Cards v. United Card Co., 429 F.2d 1106, 1110 (9th Cir.1970). Copying may be established by proof of access and substantial similarity. Id.
 
 
 87
 Once a plaintiff has demonstrated that a defendant had access to the copyrighted work and that the defendant's work is substantially similar to the copyrighted work, the burden shifts to the defendant to prove that the defendant's work was not a copy, but was independently created. Kamar International, Inc. v. Russ Berrie & Co., 657 F.2d 1059, 1062 (9th Cir.1981).
 
 
 88
 There was substantial evidence to support the jury's finding of copyright infringement. First, Ajac and Fairbanks had access to Transgo's copyrighted instruction sheets. Ajac admitted having received Transgo's instruction sheets each year since the mid-1960s. Ajac supplied Fairbanks with Transgo kits, including the instruction sheets. Second, substantial similarity was established by evidence that Fairbanks lifted from Transgo's instruction sheets all pictures, line drawings and the bulk of the text. Lupo admitted that Transgo's instruction sheets were "just plain copied." Finally, Fairbanks was unable to prove that its instruction sheets were independently created.
 
 2. Copyrightability
 
 89
 Ajac further contends that Transgo failed to show that the instruction sheets, which are admittedly derivative works, contained particular "new matter" that was entitled to protection. Work which results from the independent efforts of its author is copyrightable, even though identical work may already be in the public domain. United States v. Hamilton, 583 F.2d 448, 451 n. 4 (9th Cir.1978).
 
 
 90
 The jury found that each of Transgo's instruction sheets contained substantial original and creative material. This determination is supported by the evidence. Transgo produced all artwork, photographs, and "original pen scratchings" used in developing its instruction sheets. Some of its older instruction sheets included photographs taken from the public domain. These early instruction sheets, however, were approved for copyright by the copyright office. Under both the Copyright Act of 1909 and the Copyright Act of 1976, registration by the Copyright Office is prima facie evidence of copyrightability. 1909 Act, Sec. 55, 35 Stat. 1075, 1086 (1909) (repealed 1976); 1976 Act, Sec. 410(c), 90 Stat. 2541, 2583 (1976) (codified at 17 U.S.C. Sec. 410(c)). This presumption shifts the burden of proof to the challenging party to demonstrate why the item in question is not copyrightable. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 157 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5773. The defendants failed to meet their burden.
 
 3. Forfeiture of Copyright
 
 91
 The jury found the use by Winters Performance Products of Transgo instruction sheets that did not contain copyright notices for six years caused Transgo to forfeit its copyright protection. Ajac claims that Transgo's alleged acquiescence in Winters' action constitutes a dedication of the entire work to the public.
 
 
 92
 A copyright can be forfeited through some overt act which indicates the copyright proprietor's desire to surrender its rights. Lopez v. Electrical Rebuilders, Inc., 416 F.Supp. 1133, 1135 (C.D.Cal.1976). Acquiescence, with full knowledge in the publication of a vast number of copies without copyright notice, may work a forfeiture. Synercom Technology, Inc. v. University Computing Co., 462 F.Supp. 1003, 1011 (N.D.Tex.1978); see also 2 M. Nimmer, Nimmer on Copyright, Sec. 7.03 (1983).
 
 
 93
 Federal copyright law contains an exception to the doctrine of abandonment through publication without notice:
 
 
 94
 The omission of the copyright notice prescribed by sections 401 through 403 from copies or phonorecords publicly distributed by authority of the copyright owner does not invalidate the copyright in a work if--
 
 
 95
 (1) the notice has been omitted from no more than a relatively small number of copies or phonorecords distributed to the public.
 
 
 96
 17 U.S.C. Sec. 405(a)(1).
 
 
 97
 Here, we have neither "knowledge" by Transgo nor a "vast number" of copies. The elimination of Transgo's copyright notices occurred without the approval or knowledge of Winters Performance Products or Transgo. Also, out of all the companies that received or used Transgo's instruction sheets, Winters was apparently the only company which neglected to include the notice. Fairbanks acknowledged that "most" of Transgo's instruction sheets did include the notice. The jury's determination that Transgo has not abandoned its copyright is supported by substantial evidence.
 
 
 98
 4. Admission of Revised Fairbanks Sheets Into Evidence
 
 
 99
 Over objection, the trial court admitted Fairbanks' revised instruction sheets into evidence. A side-by-side comparison of the old and the new Fairbanks sheets was made in the jury's presence. Fairbanks contends that the evidence should have been excluded under Federal Rule of Evidence 407.
 
 Rule 407 states:
 
 100
 When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.
 
 
 101
 Under Rule 407, evidence of subsequent change may be admitted for the limited purpose of showing the practicability of making a change. See Boeing Airplane Co. v. Brown, 291 F.2d 310, 315 (9th Cir.1961). The district court's decision regarding the relevancy of evidence cannot be reversed absent abuse of discretion. M/V American Queen v. San Diego Marine Construction Corp., 708 F.2d 1483, 1491 (9th Cir.1983).
 
 
 102
 In the instant matter, Transgo explained to the district court that the primary relevance of Fairbanks' subsequent instruction sheet was to demonstrate the lack of credibility of Fairbanks' contentions that it "had to copy all of Transgo's sheets in order to compete," and that no matter what changes were made, "it would still look like it was a Transgo instruction sheet." Fairbanks' president, Lupo, admitted that the revised sheets "were adequate for purposes of marketing." Under the circumstances of this case, the evidence was admissible to show feasibility, which was controverted, or to impeach Lupo's testimony. See, e.g., Kenny v. Southeastern Pennsylvania Transportation Authority, 581 F.2d 351, 356 (3d Cir.1978) (where defendant opens up issue by claiming that all reasonable care was being exercised, plaintiff may attack that contention by showing later repairs inconsistent with it), cert. denied, 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979). The trial court did not abuse its discretion in admitting the evidence.
 
 C. CONSPIRACY TO PASS OFF
 
 103
 The jury found that appellants had passed off Fairbanks' valve body kits as Transgo "Shift Kits." Appellants contend that this finding was not supported by substantial evidence. A cause of action for "passing off" arises when one's own creation is sold under the name or mark of another. Smith v. Montoro, 648 F.2d 602, 604 (9th Cir.1981). "Express passing off occurs when an enterprise labels goods with a mark identical to that of another enterprise, or otherwise expressly misrepresents that the goods originated with another enterprise." Id. There was substantial evidence of passing off.
 
 
 104
 Appellants also challenge the sufficiency of the evidence to support the jury's finding that they engaged in a civil conspiracy in order to pass off Fairbanks' copy. A civil conspiracy occurs when the parties have reached "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." American Tobacco Co. v. United States, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 1138-39, 90 L.Ed. 1575 (1946); see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1055 (9th Cir.1981), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). A conspiracy must be looked at as a whole, and acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme. See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962).
 
 
 105
 The jury heard evidence that Ajac provided Fairbanks with confidential information concerning Transgo's pricing structure, Transgo's best-selling "Shift Kits," and Transgo's primary customers. Fairbanks purchased complete sets of Transgo's "Shift Kit" line from Ajac in order to copy them. Jacoby told Lupo to leave the name "Fairbanks" off the package and the instruction sheets. Fairbanks' employees answered the hot line with the word "Transactions." The similarity between "Transactions" and "Transgo" could suggest to a reasonable mind that the word "Transactions" was not randomly selected, but resulted from an attempt to confuse rebuilders about the origin of the kits. The jury's findings that appellants passed off Fairbanks' kits and conspired to accomplish this end is supported by substantial evidence.
 
 
 106
 Jacoby contends that it was error to hold him personally liable for Ajac's acts of unfair competition because the jury's finding, that he conspired with Fairbanks to pass off Fairbanks' imitation product, is not supported by substantial evidence. We disagree.
 
 
 107
 A corporate "officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., 467 F.Supp. 841, 852 (N.D.Cal.1979), aff'd sub nom. Murphy Tugboat Co. v. Crowley, 658 F.2d 1256 (9th Cir.1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982), quoting Ballantine, Corporations Sec. 112 (rev. ed. 1946). The evidence discussed above amply demonstrates the instrumental role Jacoby played in Fairbanks' success at copying Transgo's "Shift Kit" and at marketing the imitations as if they were Transgo products.
 
 D. FALSE DESIGNATION OF ORIGIN
 
 108
 The jury found that appellants had falsely designated the origin of the Fairbanks' valve body components. Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a), makes actionable any false designation of a product's origin.
 
 
 109
 We have determined above that substantial evidence supports the jury's determination that appellants passed off Fairbanks' valve body kits as Transgo "Shift Kits." The federal cause of action for false designation created by section 43(a) encompasses the common law action for passing off. Smith v. Montoro, 648 F.2d 602, 604 (9th Cir.1981).
 
 E. VALIDITY OF THE INJUNCTION
 
 110
 Fairbanks asserts that the injunction prohibiting appellants from using the name "Shift Kit" in connection with selling valve body parts is overly broad.
 
 
 111
 The district court permanently enjoined Fairbanks from "using any name, designation or material ... likely to cause confusion, mistake or deception as to source relative to plaintiff's trademark." In the January 1981 contempt proceedings, the court clarified the injunction after appellants had continued their use of the terms "Shift Kit" in several combinations. The new order prohibited the use of the name "Shift Kit" or any other name including the words "Shift" and "Kit." The court specifically enjoined use of the terms "Shift Timing Kit," "Posi Shift Kit," "2 Stage Shift Kit," "Posi Shift 2 Stage Kit," or "Posi Shift Single Stage Kit" on the basis that such use was likely to cause confusion with Transgo's trademark.
 
 
 112
 The grant or denial of injunctive relief rests with the sound discretion of the trial court and requires a clear abuse of discretion for a modification or reversal. To succeed in its attack on the injunction, Fairbanks must show that there was no reasonable basis for the district court's decision. SEC v. Arthur Young & Co., 590 F.2d 785, 787 (9th Cir.1979).
 
 
 113
 The scope of the injunction was based on the district court's conclusion that the use of the words "shift" or "kit" in any combination would be likely to confuse the public. Unless we find the underlying facts to be clearly erroneous, we must affirm the finding of the district court and conclude that the court acted within its discretion in enjoining the use of names likely to confuse the public. J.B. Williams Co. v. Le Conte Cosmetics, 523 F.2d 187, 191 (9th Cir.1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976).
 
 
 114
 Under Rule 65(d) of the Rules of Civil Procedure, an order granting an injunction shall "set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other documents, the act or acts sought to be restrained; ..." The basic principle of the federal rule is that those against whom an injunction is issued should receive fair and well-defined notice of what the injunction prohibits. Granny Goose Foods, Inc. v. Brotherhood of Teamsters, Local No. 70, 415 U.S. 423, 444, 94 S.Ct. 1113, 1126, 39 L.Ed.2d 435 (1974).
 
 
 115
 The injunction in the instant case precisely sets out the forbidden conduct. Fairbanks was on notice that it was prohibited from using any name or designation which was likely to cause confusion. The jury had found that Fairbanks and the other defendants had deliberately copied Transgo's trademark. The court concluded that Fairbanks had deliberately chosen names similar to Transgo's trademark in an attempt to "walk as close to the line as they can" and had deliberately and willfully ignored the previous injunction. In light of the overwhelming evidence of appellants' deliberate violations of Transgo's interest, the injunction was not overbroad. Rather, it put Fairbanks on notice that future imitations of Transgo's trademark would not be tolerated. "[A]n injunction may be framed to bar future violations that are likely to occur." United States v. An Article of Drug, 661 F.2d 742, 747 (9th Cir.1981). Under these circumstances, we do not find an abuse of discretion.
 
 
 116
 Fairbanks also maintains that the injunction violates its first amendment rights. This argument lacks merit. Commercial speech may be regulated when its content is otherwise false or misleading. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-73, 96 S.Ct. 1817, 1830-31, 48 L.Ed.2d 346 (1976). Substantial evidence was presented at trial to show that Fairbanks' use of the words "shift" and "kit" was misleading.
 
 F. CONTEMPT
 
 117
 The trial court in two separate proceedings found Fairbanks had violated the court's final judgment and injunction issued July 31, 1980, and the civil contempt order and injunction entered January 29, 1981. Fairbanks contends that the district court abused its discretion in holding Fairbanks in contempt and in assessing costs.
 
 
 118
 The decision to hold a party in contempt of a court order rests with the sound discretion of the trial court. Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc., 689 F.2d 885, 889 (9th Cir.1982). This court will not reverse unless the district court has abused its discretion. Id.
 
 
 119
 In the first contempt hearing, the district court found that the injunction issued in July of 1980 specifically set out what conduct was forbidden. The injunctive order did not limit the prohibited conduct to the use of the name "Shift Kit." Rather, it set forth a prohibition against "using any name, description or material ... likely to cause confusion, mistake or deception as to source relative to plaintiff's trademark 'Shift Kit.' " (Emphasis added). From July 1980 to January 1982, Fairbanks marketed a product it referred to as a "Shift Timing Kit" and "STK." The district court properly concluded that the injunction put Fairbanks on notice that the use of "Shift Kit" in combination with any words which would lead to confusion was prohibited. The district court did not abuse its discretion in finding Fairbanks in contempt of the July 1980 injunction.
 
 
 120
 In January 1981, the court specifically ordered Fairbanks not to use any name containing the words "shift" and "kit," including the names, "Shift Timing Kit," "Posi Shift Kit," "2-Stage Shift Kit," "Posi Shift 2-Stage Kit," and "Posi Shift Single Stage Kit." In spite of this warning, Fairbanks proceeded to market a product called "Shift in a Box" which was referred to as a "Shift Kit" in a telephone solicitation campaign. The court did not abuse its discretion in finding Fairbanks in contempt for this conduct.
 
 
 121
 The court imposed investigation costs of $5,286.01 on Fairbanks, including the cost of deposition transcripts and witness travel expenses. The imposition of costs will not be overturned absent abuse of discretion. Chavez v. Tempe Union High School District # 213, 565 F.2d 1087, 1095 (9th Cir.1977). Our task in reviewing the propriety of a sanction imposed by a district court is limited to determining whether we have a "definite and firm conviction" that it was clearly outside the court's discretion. Chism v. National Heritage Life Insurance Co., 637 F.2d 1328, 1331 (9th Cir.1981). This determination must be based upon the facts of the particular case. Id.
 
 
 122
 Costs were assessed here only after appellant failed to comply with the court's injunction and was therefore held in contempt. The district court did not abuse its discretion by imposing reasonable investigative costs.
 
 G. DAMAGES
 
 123
 The jury assessed special and general compensatory damages of $40,021 against the defendants as follows: $15,007 against Fairbanks (Copyright Infringement--$15,000 special, $1 general; Trademark Infringement $1 special, $1 general; Unfair Competition--$1 special, $1 general; False Designation of Origin--$1 special, $1 general); $25,006 against Ajac (Copyright Infringement--$1 special, $1 general; Trademark Infringement--$1 special, $1 general; Unfair Competition--$15,000 special, $1 general; False Designation of Origin--$10,000 special, $1 general); and $8 against Jacoby ($1 in each of the eight categories). The jury awarded punitive damages for unfair competition against the defendants as follows: $50,000 against Ajac; $50,000 against Jacoby; and $1 against Fairbanks.
 
 
 124
 Although the jury verdict shows a breakdown of compensatory damages among the defendants, this was done at the defendants' request for purposes of contribution and apportionment. The jury found that the defendants conspired to injure Transgo's trade identity rights and property rights. As co-conspirators, the defendants were found to be joint tortfeasors, jointly and severally liable for all compensatory damages awarded to Transgo. Joint tortfeasors are jointly and severally liable for compensatory damages. Clark v. Bunker, 453 F.2d 1006, 1011 (9th Cir.1972).
 
 
 125
 Fairbanks, Ajac and Jacoby contend on appeal that the damage award is inappropriate, because there is no substantial evidence to support the underlying verdict. As we have discussed above, the evidence was sufficient to support the jury's findings of liability. An award of damages was therefore appropriate.
 
 1. Compensatory Damages
 
 126
 Ajac and Fairbanks further contend that the evidence concerning actual damages is inadequate to support the awards of $15,000 against Fairbanks for Copyright Infringement, $15,000 against Ajac for Unfair Competition and $10,000 against Ajac for False Designation of Origin.
 
 
 127
 A copyright owner is entitled to recover actual damages as well as those profits of the infringer that are attributable to the infringement and that are not already included in the computation of actual damages. 17 U.S.C. Sec. 504(b). For the state law claims, California law also allows a recovery of lost profits. See, e.g., Glovatorium, 684 F.2d at 664.
 
 
 128
 Transgo presented evidence showing its damages were over $2 million in total. Stephen Younger, vice-president of Transgo, estimated that Transgo's lost profits were approximately $222,000. This calculation, based on Fairbanks' gross sales for three years is a conservative figure since it does not include sales in the first year of infringement. Fairbanks and Ajac argue that Younger's method of estimating net profits based on these figures was speculative. They agree that Transgo did use the dollar amount of gross sales of Fairbanks' kits for three years. Transgo's burden was only to show the gross revenue from the sales of the Fairbanks imitation kits. It was Fairbanks' and Ajac's burden to prove their deductible expenses and elements of profit attributable to factors other than infringement of Transgo's product. See 17 U.S.C. Sec. 504(b) (copyright owner is required to present proof of infringer's gross revenue; infringer must prove deductible elements). As Transgo introduced evidence that sales of the imitation kits exceeded $200,000, an award of a total of $40,000 is not excessive.
 
 
 129
 It is the function of the jury, not of this court, to weigh conflicting evidence and judge the credibility of witnesses. Glovatorium, 684 F.2d at 660 (9th Cir.1982). The jury's award of special compensatory damages against the defendants is supported by substantial evidence and will not be disturbed.
 
 2. Punitive Damages
 
 130
 The jury awarded punitive damages of $50,000 against Ajac and Jacoby each and $1 against Fairbanks. Ajac and Jacoby attack the awards on the grounds that they are unsupported by the evidence and are excessive in amount. Ajac contends there was not sufficient proof of actual damages to support such an award while Jacoby individually argues that the ratio of punitive to compensatory damages is excessive and unreasonable.
 
 
 131
 As discussed earlier, California law allows the recovery for lost profits as well as actual damages for successful copyright infringement and unfair competition claimants. In addition, where actual damages are shown, the jury may also award punitive damages when it determines that the wrongdoers acted maliciously, wantonly or oppressively. Cal.Civ.Code Sec. 3294. Malicious, wanton or oppressive conduct may be found by wrongful conduct done willfully, intentionally and in reckless disregard of its possible injurious consequences. Id. Transgo presented substantial evidence of the defendants' deliberate and willful disregard of Transgo's property rights. The trial judge concluded that all appellants acted in reckless disregard of Transgo's rights. A punitive damage award under these circumstances is appropriate. Id.
 
 
 132
 Ajac contends that the evidence is insufficient to support an award of punitive damages because of the lack of proof of actual damages. We disagree. As detailed above, Transgo presented sufficient evidence to establish actual damages; consequently, the punitive damage award has proper support. The determination to award punitive damages here was "within the exclusive province of the jury," Runge v. Lee, 441 F.2d 579, 584 (9th Cir.), cert. denied, 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971). We will not overturn such an award unless it appears that the jury was influenced by passion or prejudice. Harmsen v. Smith, 693 F.2d 932, 947 (9th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Appellants have not demonstrated from the record that the jury was influenced by passion or prejudice.
 
 
 133
 Jacoby individually contends that, as a matter of law, where compensatory damages are $2 and punitive damages are $50,000, the resulting ratio is excessive and should not be upheld. This argument ignores the fact that the jury found that all three defendants were co-conspirators. Accordingly, they are jointly and severally liable for all the compensatory damages awarded by the jury. When this fact is properly considered, the ratio or punitive damages for unfair competition to the amount awarded for compensatory damages drops from 25,000:1 to 50,000:15,005 or about 3 1/3:1. While California law requires that punitive damages bear a reasonable relationship to compensatory damages, there is no fixed ratio or formula for determining the proper proportion between the two. Liodas v. Sahadi, 19 Cal.3d 278, 284, 137 Cal.Rptr. 635, 562 P.2d 316 (1977); Oakes v. McCarthy Co., 267 Cal.App.2d 231, 263, 73 Cal.Rptr. 127 (1968). The ratio of Jacoby's punitive damages for unfair competition to the compensatory damages for unfair competition for which he is liable as a joint tortfeasor is reasonable.
 
 
 134
 An award of punitive damages is not considered excessive as long as it punishes the wrongdoer without causing financial ruin. El Ranco, Inc. v. First National Bank of Nevada, 406 F.2d 1205, 1219 (9th Cir.1968), cert. denied, 396 U.S. 875, 90 S.Ct. 150, 154, 24 L.Ed.2d 133 (1969). Jacoby testified at trial that his personal net worth was $1 million and his most recent annual income was $200,000. He further testified that Ajac's estimated worth was $2 million and that its most recent annual sales were over $10 million. The awards of $50,000 in punitive damages against both Jacoby and Ajac constitute relatively small percentages of their respective net worths--5% for Jacoby and 2.5% for Ajac. These punitive damage awards are not excessive; they will not cause either of the defendants to suffer financial ruin.
 
 H. ATTORNEY'S FEES
 
 135
 In May 1980, Transgo filed a request for attorney's fees for the period from December 1976 through the end of the litigation. Transgo claimed that its attorney was required to work 2,522 hours on this case and sought payment at $60 to $75 per hour. Appellants opposed the request on numerous grounds.
 
 
 136
 The court awarded Transgo $250,254 in fees. Appellants argue that the award of fees is contrary to law and an abuse of discretion.
 
 
 137
 The American rule is that attorneys' fees are not ordinarily recoverable as costs for the prevailing party. Although courts have a general power in equity to award fees as part of the costs, particularly when the opposing party has acted in bad faith, vexatiously, wantonly or oppressively, see e.g., F.D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974); Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973), the Supreme Court held that this power did not apply in Lanham Act cases because Congress acted to circumscribe the general powers of the courts by prescribing detailed remedies under section 35. See Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718-20, 87 S.Ct. 1404, 1407-08, 18 L.Ed.2d 475 (1967). See also Pachmayr Gun Works, Inc. v. Olin Mathieson Chemical Corp., 502 F.2d 802, 812 (9th Cir.1974) (concluding that neither Lanham Act nor unfair competition cases present the kind of "exceptional circumstance" that permitted recovery of fees as a matter of equity).
 
 
 138
 In 1975, however, Congress amended section 35 to permit the recovery of fees for the prevailing party in "exceptional cases." Act of Jan. 2, 1975, Pub.L. No. 93-600, Sec. 3, 88 Stat. 1955. In the case before us, the district court awarded attorneys' fees under section 35, 15 U.S.C. Sec. 1117. By its terms, the remedies available under section 35 apply only to cases involving registered trademarks. We have not yet determined, however, to what extent the provisions of section 35 also apply to section 43(a), the provision for unregistered trademarks, which is the provision applicable to this case. In Rickard v. Auto Publisher, Inc., 735 F.2d 450 (11th Cir.1984), the court reviewed the language, interpretations, and legislative history of sections 35 and 43(a), and concluded that the congressional purposes of uniformity and simplicity in the trademark laws could be furthered only if attorneys' fees were recoverable under section 43(a). See id. at 453-58. All of the other circuits faced with this issue have reached the same result. See Metrics & Multistandard Components Corp. v. Metric's, Inc., 635 F.2d 710, 715-16 (8th Cir.1980) (concluding that section 35 remedies were the exclusive remedies for section 43(a)); see also Burndy Corp. v. Teledyne Industries, Inc., 748 F.2d 767, 771-72 & n. 3 (2d Cir.1984) (assuming without deciding that section 35 remedies applied to section 43(a)); Donsco, Inc. v. Casper Corp., 587 F.2d 602, 608 (3d Cir.1978) (same).
 
 
 139
 This analysis is persuasive, and we conclude that at least with respect to attorneys' fees, the remedial provisions of section 35 apply to actions under section 43(a). The core of the Fleischmann opinion was that Congress' failure to provide for attorneys' fees as part of a meticulous remedial scheme precluded the courts from doing so on their own; to do so would have been to evade congressional intent. See 386 U.S. at 719-20, 87 S.Ct. at 1407-08. Now, however, Congress has spoken and clearly intends the recovery of attorneys' fees in registered trademark cases. Further, like the other circuits, we can see no reason to distinguish between registered and unregistered trademarks for purposes of attorneys' fees. The type of conduct that these damages should deter is unrelated to the type of intellectual property protected. It would be anomalous to provide for attorneys' fees in copyright actions, 17 U.S.C. Sec. 106, registered trademark actions, 15 U.S.C. Sec. 1117, and patent actions, 35 U.S.C. Sec. 285, but not in unregistered trademark actions. We do not believe this is what Congress intended. Moreover, our result is consistent with Fleischmann, which "conclude[d] that Congress intended Sec. 35 of the Lanham Act to mark the boundaries of the power to award monetary relief in cases arising under the Act." 386 U.S. at 721, 87 S.Ct. at 1408. Since the "boundaries" of relief now include attorneys' fees, we conclude that the district court could exercise its discretion to award this element of damages to Transgo.[2]
 
 
 140
 Our holding in this regard, however, is limited to attorneys' fees, and we do not hold that section 35 provides the exclusive remedies for section 43(a) actions because the facts of this case do not present the opportunity to examine the issue fully. See, e.g., Rickard, 735 F.2d at 458 n. 34 (declining to decide the exclusivity issue).
 
 
 141
 In this case, the district court awarded attorneys' fees on both equitable and statutory grounds. We need not reach the issue of whether the subsequent amendment or other authority permit a district court to award attorneys' fees under section 43(a) as a matter of equity, because we conclude that there was statutory authority for the award. Our review of the record reveals that substantial evidence supported the district court's finding that the appellants' violation of Transgo's trademark rights and copyrights and their conspiracy to pass off an imitation product constituted extraordinary, malicious, wanton, and oppressive conduct. Thus, we conclude that the district court appropriately awarded fees in an "exceptional case."
 
 
 142
 The district court also concluded that the "attorney's fees may be awarded under the laws relating to copyright, 17 U.S.C. Sec. 106; an award of fees under the copyright laws is appropriate where a defendant has willfully or deliberately infringed a copyright." Indeed, section 505 of the 1976 Copyright Act, 17 U.S.C. Sec. 505, permits the trial court in its discretion to award a reasonable attorney's fee to the prevailing party in a copyright infringement action. We will not reverse such an award absent abuse of discretion. Russell v. Price, 612 F.2d 1123, 1132 (9th Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2919, 64 L.Ed.2d 809 (1980).
 
 
 143
 The Supreme Court, in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983), noted that a prevailing party is one who succeeds on any significant issue in the litigation by achieving some of the relief sought. Clearly, in the case before us, Transgo was the prevailing party in the copyright infringement claim.
 
 
 144
 Appellants argue that section 106 is not applicable where the defendants have presented a "good faith" defense. Some courts, we have observed, recognize that a showing of good faith may justify a denial of fees. Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 832 (11th Cir.1982); Boz Scaggs Music v. KND Corp., 491 F.Supp. 908, 915 (D.Conn.1980). Here, however, the district court awarded attorney's fees because it found that appellants acted in bad faith. The district court and the jury rejected appellants' defense that they innocently infringed in the mistaken belief that Transgo had abandoned its copyright. Our review of the record convinces us that the court and jury did not err. The district court did not abuse its discretion in determining that attorney's fees could be awarded pursuant to 17 U.S.C. Sec. 106.
 
 
 145
 In Hensley, the Supreme Court also discussed the factors to be considered in awarding a "reasonable" attorney's fee pursuant to a statutory command. The Court pointed out that the "most useful starting point for determining the amount ... is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." 103 S.Ct. at 1939. Excluded from this fee calculation are hours that are not reasonably expended, i.e., hours that are "excessive, redundant, or otherwise unnecessary." Id. 103 S.Ct. at 1940. The Court went on to state that the "extent of a plaintiff's success is a crucial factor in determining the proper amount." Id. 103 S.Ct. at 1943. Where a plaintiff has achieved only limited success, the district court should award only those fees which are reasonable in relation to the result obtained. Id. The Court stated:
 
 
 146
 Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded .... [But w]here a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fees reduced simply because the district court did not adopt each contention raised.
 
 
 147
 Id.
 
 
 148
 The district court made specific findings as to Transgo's substantial success on the majority of the claims and concluded that the number of hours worked were reasonably calculated to achieve the results obtained. Most importantly, the district court expressly excluded from its calculations hours worked on a matter which the court considered to be frivolous. This exclusion provides a clear indication that the court properly exercised its discretion and understood its obligations to exclude those hours worked on separate and distinct contentions unrelated to the successful claims. Finally, the hourly rate claimed by Transgo's attorney appears reasonable to us in light of the complex issues litigated in this matter.
 
 
 149
 The district court also found that Transgo's motion for attorney's fees was not barred by Fed.R.Civ.P. 59(e). Rule 59(e) provides that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment." Appellants argue that the motion for fees was filed beyond the ten day time limit. Transgo filed its motion for attorney's fees May 23, 1980. Final judgment in this matter was not entered until July 31, 1980. Therefore, the motion for attorney's fees was not time barred under Rule 59(e).
 
 
 150
 The record discloses, moreover, that the parties stipulated on May 15, 1980, that Transgo would be allowed to file all post judgment motions by May 23, 1980. Thus, the filing of the motion for attorney's fees was not untimely under the stipulation.
 
 
 151
 Appellants also challenge the validity of the award of attorney's fees for work performed in connection with the contempt hearings. Subsequent to the issuance of the final judgment, Transgo filed motions on three separate occasions seeking contempt orders against Fairbanks for violating the injunction.
 
 
 152
 In the first contempt proceeding, the court granted Transgo's motion after finding that Fairbanks had violated the injunction by marketing its product under the name "Shift Timing Kit" and under the designation "STK." Fairbanks was ordered to pay Transgo $8,902 in attorney's fees incurred in connection with this proceeding.
 
 
 153
 A second motion was heard on June 15, 1981, wherein Transgo alleged that Fairbanks used the words "Shift Kit" in a telephone sales campaign. The court declined to rule "one way or the other" on "the question of the representations made in the sales pitch." Thus, the court did not reach the merits of this alleged violation of the court's order.
 
 
 154
 On October 19, 1981, the court found Fairbanks in contempt for using the words "Shift Kit" in various sales campaigns, and awarded attorney's fees to Transgo in the amount of $34,251.50.
 
 
 155
 Appellants contend the amount of fees was excessive and that the court improperly included fees based on the unsuccessful June motion. The trial court awarded Transgo attorney's fees for services performed since March 1981 in connection with the claim that Fairbanks used "Shift Kit" in telephone solicitations. Fairbanks asserts that the trial court abused its discretion by awarding attorney's fees for work performed on the motion for a contempt order which was denied by the court.
 
 
 156
 The June and October motions filed by Transgo alleged the same conduct as violative of the court's order. Transgo was not unsuccessful on the merits of the June motion. As noted above, the court declined to rule on the effect of the telephone "sales pitch" in June. Transgo was successful, however, in presenting the same contention in October. Under Hensley, a court may award attorney's fees where success has been achieved on related claims. Hensley, 103 S.Ct. at 1943. Here the claims were identical. Under the circumstances of this case, the amount awarded was neither excessive nor an abuse of discretion.
 
 III
 ISSUES RAISED BY TRANSGO ON ITS CROSS-APPEAL
 
 157
 Transgo raises three issues in its cross-appeal.
 
 
 158
 A. SUFFICIENCY OF THE EVIDENCE TO SHOW FUNCTIONALITY OF THE COLOR CODE
 
 
 159
 After hearing all of the evidence, the jury expressly found that Transgo's color coded springs serve primarily to help rebuilders install "Shift Kits," rather than to designate Transgo as the Kits' manufacturer. Transgo requests that this matter be remanded "with respect just to its own appeals with instructions to prescribe appropriate injunctive relief." Transgo contends that no substantial evidence was presented to support the jury's determination that the spring color coding system was primarily functional. We disagree.
 
 
 160
 Functional features, unlike trade dress, are not protected by the laws of unfair competition. This court discussed the concepts of functionality and trade dress in Fabrica Inc. v. El Dorado Corp., 697 F.2d 890 (9th Cir.1983).
 
 
 161
 "Functional" ... might be said to connote other than a trade-mark purpose. If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made.
 
 
 162
 Id. at 894-95, quoting Pagliero v. Wallace China Co., 198 F.2d 339, 343 (9th Cir.1952) (emphasis added).
 
 
 163
 The evidence on the question of the primary function of the color coding was conflicting. The jury heard evidence from a number of rebuilders that the colored springs identify where in the valve body the springs belong. One transmission shop owner testified that Spanish-speaking employees learn to install the valve body components on the basis of the springs' colors. The jury was told that if the colors were changed, his rebuilders would not know where to install the springs. "It is the function of the jury, not of this court, to weigh conflicting evidence and judge the credibility of witnesses." Glovatorium, 684 F.2d at 660. The jury apparently believed that the springs' colors were primarily of assistance in installing the kits. Substantial evidence supports this finding.
 
 B. INSTRUCTION SHEETS AS TRADE DRESS
 
 164
 The jury found that the primary significance of the instruction sheets to rebuilders was as an aid to installation. The evidence was conflicting. The testimony of certain rebuilders established that the instruction sheets were initially used by inexperienced rebuilders as a guide to installation. Once the rebuilder gained experience, however, the instructions were thrown away without being read. They relied, instead, on the colors of the springs. The jury was persuaded that the primary purpose of the instruction sheets was functional. In reviewing the sufficiency of the evidence, conflicting evidence is viewed favorably to the prevailing party. On the instant issue, there is sufficient evidence to support the jury's finding.
 
 C. FAIRBANKS' ADVERTISING CLAIMS
 
 165
 Transgo sought to convince the jury that Fairbanks was guilty of false advertising. Fairbanks published advertisements which stated that Fairbanks was "the FIRST name in Shift Kits." Fairbanks' ads also claimed, "For No Returns, No Complaints ... Insist On the Fairbanks Kit ..." Further, Fairbanks told consumers that Fairbanks' and Transgo's kits were equal in quality.
 
 
 166
 There was testimony that Fairbanks' advertisements were neither misleading nor false. For example, one of Transgo's witnesses testified on cross-examination that after reading Fairbanks' "FIRST name" advertisement in toto, he realized it referred to Fairbanks rather than Transgo. Although Transgo presented evidence concerning the superior quality of Transgo's kits, two witnesses testified that they had, on occasion, received defective products from Transgo. One rebuilder testified concerning Fairbanks' "No Returns" claim as follows: "When I see those types of claims in advertising, they just kind of go in one ear and out the other. I still evaluate the product on other bases." This testimony provided substantial evidence to support the jury's finding that these advertising claims were "merely puffing."
 
 
 167
 D. PROPRIETY OF A REMAND FOR AN ACCOUNTING ON THE ASSESSMENT
 
 OF FURTHER SANCTIONS
 
 168
 Transgo seeks a remand of this matter for a modification of the injunction and to "determine monetary relief due since trial for contempt ...." Transgo maintains that the district court abused its discretion in not awarding punitive damages or fines and in failing to order an accounting.
 
 
 169
 We decline the invitation to remand the case to the district court with directions to order such proceedings. If there have been additional post-trial infringements, Transgo may apply directly to that court for an appropriate remedy.
 
 
 170
 When dealing with its equitable powers, a court possesses the intrinsic power to adapt the injunction to meet the needs of a "new day." Atlas Scraper & Engineering Co. v. Pursche, 357 F.2d 296, 298 (9th Cir.1966). The district court has continuing jurisdiction over such matters as the modification of injunctive relief. Hoffman v. Beer Drivers & Salesmen's Local 888, 536 F.2d 1268, 1276 (9th Cir.1976). Under its continuing jurisdiction, the district court must supervise the injunctive relief granted, and may order an accounting or award punitive damages and fines where the injunctive relief has proven insufficient to protect trademark rights. See Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 123 (9th Cir.1968), cert. denied, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968) (both the trademark owner and the buying public are slighted if the court provides no greater remedy than an injunction).
 
 
 171
 The judgment is AFFIRMED.
 
 
 
 *
 Honorable Charles L. Hardy, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The defendants also present a general challenge to the adequacy of Transgo's overall policing efforts in protecting the name "Shift Kit" from unauthorized use. They include evidence of magazine advertisements wherein other companies have used "Shift Kit" in denoting or describing their product
 Evidence of Transgo's policing efforts to stop misuse and unauthorized display of "Shift Kit" in the marketplace is reflected throughout the record. The largest publisher carrying ads marketing "Shift Kit" honored Transgo's demand to remove the term from its directory and product listings. 4819-20. Other publishers also cancelled the use of "Shift Kit" in their directories because of pressure from Transgo, switching instead to the generic term "valve body kit." 3858-60, 3665-66. One producer agreed to quit using the name when Younger warned that he was "going to sue." 198-202. Others also agreed to stop using Transgo's name upon demand by Transgo. Aamco 3868, Hurst 443, 3627. Thus, the two exceptions, the companies who had displayed "Shift Kit" in magazine ads and on their boxes either no longer exist or have stopped their use under demands from Transgo. The two remaining users, B & M and Turbo Action, have each received notice from Transgo to stop infringing on "Shift Kit." PX 249, RT 3668-89. "[A]n owner is not required to act immediately against every possible infringing use to avoid a holding of abandonment. Such a requirement would unnecessarily clutter the courts." Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp., 680 F.2d 755, 766 (C.C.P.A.1982); United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 139 (3d Cir.1981).
 
 
 [2]
 New West Corp. v. NYM Co., 595 F.2d 1194 (9th Cir.1979), does not force the opposite conclusion. In New West, a section 43(a) case, we stated without discussion or reference to the amendment of section 35, "that attorney fees are not recoverable in trade-mark infringement cases under the Lanham Act." Id. at 1202 (citing Fleischmann ). We then concluded that California law would not have permitted the recovery of attorneys' fees under the facts of that case. Id. at 1202-03. New West is distinguishable on two grounds. First, the issue presented in this case, whether section 35 remedies applied to section 43(a), was not squarely presented to the court. Second, even if it had been presented, we would not have had to reach the issue to decide that case, because it is distinguishable on its facts. The record in New West did not contain evidence of bad faith or other opprobrious conduct, unlike the record in this case. See id. at 1196-98, 1203