959 F.2d 241
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Delores P. RIVERA; Robert Pease; S. Madalene Pease;
Thomas A. Duffy; Ann D. Duffy; Stanley Downs;
Janae Downs; Gregory H. Abeson; Arline
H. Abeson, Petitioners-Appellants,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellee.
 No. 91-70086.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 3, 1992.
Decided March 31, 1992.
 
 Before ALARCON, BEEZER and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Abeson appeals a tax court decision upholding IRS deficiencies asserted against him. We affirm.
 
 
 3
 Abeson initially filed a tax court petition seeking a redetermination of deficiencies asserted by the IRS. The tax court upheld the IRS determinations, and Abeson filed a Motion for Reconsideration of Opinion With Trial De Novo on May 25, 1990. The tax court, on May 22, 1990, denied the motion except that two sentences of the opinion, referring to more than 150 stipulations allegedly executed by Abeson's attorney, Wegge, were deleted. On June 14, 1990, Abeson filed a Motion to Vacate Assignment, Opinion and Order of Special Trial Judge Peter J. Panuthos. In this motion, Abeson alleged that Judge Panuthos lacked the authority to hear this case, that Judge Panuthos engaged in misconduct and fraud, and that several witnesses committed perjury. The next day, the tax court denied this motion without comment.
 
 
 4
 On October 19, 1990, Abeson attempted to file a Motion to Revise Opionion and a Motion for Reconsideration for Trial De Novo, both of which essentially reasserted Abeson's prior allegations of perjury and fraud. These motions were not timely under the thirty-day time limit imposed by Tax Court Rules 161 and 162, and Abeson therefore filed Motions for Special Leave to file these two motions. The tax court denied these motions without discussion on October 24, 1990.
 
 
 5
 Abeson now appeals the decisions entered against him. Abeson essentially argues that the tax court erred in rejecting the arguments he proffered in his various post-trial motions. Although the tax court did not state reasons for denying these motions, we will assume that the court considered and rejected Abeson's arguments on the merits.
 
 
 6
 We review the tax court's denial of these motions for abuse of discretion. See, e.g., Molloy v. Wilson, 878 F.2d 313, 315 (9th Cir.1989) (denial of motion to vacate judgment will be reversed only upon clear showing of abuse of discretion); Transgo, Inc. v. AJAC Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir.1985) (denial of motion for new trial or motion to amend judgment reviewed for abuse of discretion), cert. denied, 474 U.S. 1059 (1986); Parkinson v. Commissioner, 647 F.2d 875, 876 (9th Cir.1981) ("The Tax Court's denial of a motion for reconsideration will not be overturned on appeal absent a clear abuse of discretion.").
 
 I. Use of a Special Trial Judge
 
 7
 Abeson argues that, because the initial tax court petitions were filed prior to October 25, 1982, the chief judge of the tax court exceeded his statutory authority under 26 U.S.C. § 7443A(b)(4) in assigning Abeson's case to be heard by a special trial judge. Abeson also argues that § 7443A(b)(4) violates the Appointments Clause of the Constitution, art. II, § 2, cl. 2. Abeson's counsel conceded in oral argument, however, that Freytag v. Commissioner, 111 S.Ct. 2631, 2638-39, 115 L.Ed.2d 764, 779-88 (1991), is controlling, and that Freytag rejected both arguments.
 
 
 8
 Abeson next claims that the tax court erred by failing to make findings of fact required by 26 U.S.C. § 7459(b) when it rejected his challenge to the assignment of a special trial judge. However, because whether the chief judge had the authority to assign a special trial judge is a legal issue, no factual findings were required in order to resolve it.[1]
 
 II. Perjury by Government Witnesses
 
 9
 Abeson next alleges perjury by three government witnesses and Tax Court Judge Ruwe. Abeson based his motion on testimony at trial and adduced no new evidence in support.
 
 A. Testimony of B.J. Frazier
 
 10
 Abeson claims that Frazier committed perjury when she testified that her tax returns prepared by Berg & Allen had not been audited, when she concealed her 1984 testimony as a government witness in the prosecution of Treash, and when she claimed that she did not know Treash very well.
 
 
 11
 The Tax Court did not abuse its discretion in rejecting Abeson's motion, because Frazier did not testify that her Berg & Allen prepared tax returns had never been audited. She merely stated that she had never been audited by the IRS "with regards to that [Berg & Allen] tax shelter." Even though Frazier may have been audited in 1978, that does not establish that she lied when she testified that the IRS had never audited her Berg & Allen tax shelter, which was first used in the 1979 taxable year.
 
 
 12
 Second, Frazier did not conceal the fact that she testified as a witness in the Treash prosecution. Frazier testified that she assisted the government in its investigation and that she wore a "wire" in order to record a meeting with Treash.
 
 
 13
 Finally, Abeson made no showing that Frazier perjured herself when she testified that she did not know Treash very well. Abeson presented no evidence indicating that Frazier was concealing a more extensive relationship with Treash.
 
 B. Testimony of IRS Special Agent Hessler
 
 14
 Abeson asserts that Hessler committed perjury by denying the existence of any grand jury investigation of Berg prior to 1981.
 
 
 15
 Hessler testified that he was unaware of any grand jury proceedings prior to 1981. During an earlier portion of his testimony, Hessler expressed concern over whether he could legally disclose information regarding the IRS's prior investigation of Berg. According to Abeson, Hessler's statements that he was unsure whether he could answer certain questions demonstrates that Hessler was aware of a 1978-79 grand jury investigation of Berg. This, claims Abeson, proves that Hessler lied when he later stated that he was unaware of other grand jury proceedings.
 
 
 16
 However, Hessler's earlier testimony merely demonstrates that he was concerned that answering certain questions might violate either Fed.R.Crim.P. 6(e) or 26 U.S.C. § 6103. Because Hessler's earlier testimony does not establish that he knew of a specific 1978-79 grand jury investigation, that testimony is not in conflict with his subsequent testimony that he was unaware of any pre-1981 grand jury investigation of Berg.
 
 C. Testimony of Mary Pappas
 
 17
 Abeson argues that IRS Section Chief Pappas perjured herself when she testified that the IRS kept no record of codes used to identify tax preparers filing allegedly fraudulent tax returns.
 
 
 18
 Pappas testified that the old codes were not officially kept in any IRS service center, but she acknowledged that they could be maintained unofficially. She also stated that the old codes "should" be destroyed, not that they always were destroyed. Prior to Pappas's testimony, however, the IRS had provided the tax court with certain documents that contained the old identification codes.
 
 
 19
 The fact that an IRS Service Center Director was able to locate documents containing the codes does not contradict Pappas's testimony, and it does not indicate that Pappas was lying when discussing the existence of old codes.[2]
 
 D. Declaration of Judge Ruwe
 
 20
 Abeson argues that Judge Ruwe intentionally misled the court and Abeson by implying that his employment with the Office of Chief Counsel began in 1979. Judge Ruwe never denied working for the IRS prior to 1979, however, and his declaration is not phrased in a manner that would tend to deceive the court or Abeson.
 
 
 21
 Abeson also argues taht, as a former IRS Special Agent, Judge Ruwee had probable first-hand knowledge of Berg's practice of negotiating his client's refund checks, and thus that Judge Ruwe lied when he disclaimed any first-hand knowledge of the transactions underlying the Berg & Allen cases. However, Abeson presented no evidence to support his contention.
 
 
 22
 Finally, Abeson argues that Ruwe improperly transmitted an unfiled copy of Ruwe's declaration to Judge Panuthos, but Abeson has proffered no evidence to this effect.
 
 
 23
 III. Findings of Fact Are Contrary to and Unsupported by the Record
 
 
 24
 Abeson next argues that Judge Panuthos made several findings of fact ("core Abeson findings") which Panuthos knew were false. Because these factual findings were not clearly erroneous, see Mayors v. Commissioner, 785 F.2d 757, 759 (9th Cir.1986), the tax court did not abuse its discretion in declining to accept Abeson's contentions.
 
 
 25
 A. Findings of Fact Pertaining to Stipulations
 
 
 26
 Abeson first argues that Judge Panuthos's report erroneously concluded that "Attorney Wegge ... executed more than 150 such stipulations with respect to petitioners represented by him." Abeson, p 90,190 PH Memo TC at 883. Judge Fay, however, ordered that this erroneous reference to the stipulations be stricken from the final Abeson opinion.
 
 
 27
 B. Findings of Fact Pertaining to the 1978-79 Grand Jury
 
 
 28
 Abeson next challenges the following language from the tax court's opinion:
 
 
 29
 In February 1979, the United States Attorney advised the Department of Justice it would not proceed with a prosecution of Berg for the 1972 and 1973 years. However, the United States Attorney asked for authorization to extend the scope of a Grand Jury investigation for possible violations for the 1974 through 1977 years. This request was based on a further investigation by IRS agents made at the request of the United States Attorney. The request to extend Grand Jury authorization was apparently declined by the Department of Justice.
 
 
 30
 Abeson, p 90,190 PH Memo TC at 888.
 
 
 31
 Abeson argues that those findings are contradicted by two letters sent by the U.S. Attorney's office to the Tax Division of the Department of Justice. In the first letter, dated February 28, 1979, the Assistant U.S. Attorney wrote that "[t]his [U.S. Attorney's] office would, therefore, request to extend the scope of its Grand Jury investigation of Mr. Berg to include the years 1974 through 1977." On August 30, 1979, after learning that the IRS's Chief Counsel opposed the request for an extension of the grand jury, the U.S. Attorney "decided not to prosecute Mr. Berg for the calendar year 1973," and instead to "clos[e] the case on him."
 
 
 32
 The findings in the opinion are not contradicted by the two letters. The opinion noted that in February 1979, the U.S. Attorney's office requested authorization to extend its grand jury investigation of Berg. This is consistent with the February 1979 letter.[3] The opinion then states that the request apparently was declined by the Department of Justice. This conclusion is not inconsistent with the statement in the August 30, 1979 letter to the Department of Justice that "I [the Assistant U.S. Attorney] have been informed that Chief Counsel, IRS, opposes this request for extension of the grand jury." The only discrepancy is that the opinion indicates that the Department of Justice declined authorization, while the letter indicates that it was the IRS that opposed the request and that the Department of Justice and the U.S. Attorney acquiesced to the IRS's position. This discrepancy is not so great as to render clearly erroneous the tax court's conclusion that the request apparently was denied by the Department of Justice.
 
 
 33
 Abeson also challenges the accuracy of the tax court's finding that "there was no improper use of Grand Jury information in the examination of the returns and in the preparation of the notices of deficiency involved in these cases." Abeson, p 90,189 PH Memo TC at 897. According to Abeson, the IRS, contrary to the tax court's findings, used grand jury information and material in preparing its civil case against the taxpayers. Abeson has failed, however, to point to any evidence which indicates that the IRS improperly used grand jury material.
 
 
 34
 Abeson first asserts that Special Agent Reimer, who worked on the IRS's criminal investigation of Berg, improperly disclosed grand jury information to the IRS Civil Examination Department. The evidence, however, does not support this contention. Reimer never stated that he provided grand jury information to the Examination Division; he merely testified that, after he completed an investigation, he would prepare a report that would recommend whether or not to prosecute the subject of the investigation. After such a report was made, the normal procedure was to send a letter to the Examination Division notifying it of the results of the investigation and telling that Division to take whatever action it deemed appropriate. This testimony only indicates that, after investigating Berg, a letter may have been sent to the Examination Division notifying it of Reimer's conclusions and his recommendation.[4]
 
 
 35
 Similarly, IRS Group Manager Ted Mayer never stated that he received grand jury information when investigating Berg. All he said was that he could not recall how he received a group of Berg & Allen returns which he audited. That testimony has nothing to do with the use of grand jury information. Additionally, Agent Hessler, who investigated Berg while working for the Criminal Investigation Division, specifically stated that he never turned over any grand jury information to Ted Mayer or anybody else in the Examination Division.
 
 
 36
 Abeson also argues that Berg's client list originally was derived from the grand jury investigation of Berg, and that it subsequently was improperly provided to the IRS civil investigators.
 
 
 37
 Sometime prior to December 1979, Donald Halper, a former employee of Berg & Allen and an IRS witness, provided IRS Agent Cossentine with a confidential list of Berg's clients. According to Abeson, Agent Reimer first received this list from Halper during the grand jury investigation of Berg. Then, pursuant to instructions from Reimer, Halper furnished this material to Agents Mayer and Cossentine for use in their civil investigation. Abeson, however, has presented no evidence indicating that Halper was acting at the behest of Reimer, or that Reimer had previously obtained the list from Halper during the grand jury investigation.
 
 
 38
 Finally, Abeson argues that the Examination Division was only able to locate the Berg & Allen prepared returns, which they subsequently audited, by improperly relying on the grand jury investigation of Berg. Abeson presented no evidence to support his contention.[5] Also, the testimony of various witnesses, such as Pappas and Reimer, tends to support the IRS's contention that grand jury information was not relied upon and that the Questionable Refund Program actually located many of the returns because the returns all used the same address.[6]
 
 3. Findings Pertaining to the Refund Checks
 
 39
 Next, Abeson argues that Judge Panuthos intentionally made a false finding of fact when he concluded that "petitioners failed to establish the IRS was aware of or should have been aware of Berg's scheme at the time the refund checks were mailed." Abeson, p 90,190 PH Memo TC at 895. The documents cited by Abeson, however, do not support his theory that Judge Panuthos's findings were clearly erroneous.
 
 
 40
 Abeson points to a Memorandum of Interview, which is an IRS-prepared summary of a 1974 interview between two IRS Special Agents and Berg. The summary states that "[a]ll of the clients [Berg] saw after March 31, 1974 gave a power of attorney and specific instructions for use of refund." This statement does not put the IRS on notice that Berg was actually negotiating his client's refund checks. A standard power of attorney allows a return preparer, such as Berg, to receive his clients' refund checks. Thus, the existence of a power of attorney does not, in and of itself, indicate that Berg was then negotiating those checks.
 
 
 41
 The statement that all the clients gave "specific instructions for use of refund" could indicate that the clients were giving Berg the power to negotiate their checks. The statement, however, could also mean that the clients simply were instructing Berg where to send the checks after he received them. Additionally, the fact that such instructions were executed does not necessarily indicate that Berg actually was negotiating checks. Because the statement is ambiguous, the tax court did not commit clear error when it concluded that the IRS was not aware that Berg was cashing his clients' checks.[7]
 
 
 42
 Abeson next relies on a memorandum written by IRS attorney James Keightley to support his contention that the IRS knew that Berg was cashing his clients' refund checks. The Keightley memo, however, does not deal with Berg at all. Rather, the memo discusses IRS investigations "involving the filing of tax returns under fictitious names with falsified W-2 statements," a Secret Service investigation of "forgery of the resulting tax refund checks," and the ability of the IRS to disclose information to the Secret Service. This is unrelated to Berg and does not indicate that the tax court's findings relating to the IRS's knowledge of Berg's activities are erroneous.
 
 IV. Due Process Violations
 
 43
 Although Abeson alleges due process violations, the gravamen of his argument is that the tax court erred in the application of an evidentiary privilege. We review evidentiary rulings for abuse of discretion and will not reverse absent some prejudice. Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1989).
 
 
 44
 Abeson argues that the tax court erred by failing to engage in the requisite independent de novo review of the Commissioner's determination pursuant to 5 U.S.C. § 552(b)(7) and 26 U.S.C. § 6103(b)(2) to withhold documents. See Long v. United States IRS, 742 F.2d 1173, 1182-83 (9th Cir.1984). Rather, claims Abeson, the tax court either never received the documents to review at all or the court ignored the documents.
 
 
 45
 With regard to the documents provided to the court on September 28, 1988, the record demonstrates that the tax court received the documents, reviewed them in camera in compliance with Long, and then ruled that the IRS properly refused to disclose the documents.
 
 
 46
 The tax court's treatment of documents submitted by the IRS on October 7, 1988 also was not an abuse of discretion. On September 29, 1989, the court informed the parties that it would consider additional documents if they were submitted by the IRS, and that it would notify the parties and serve the documents on Abeson if the court determined that the IRS could not withhold those documents. The IRS then submitted documents on October 7, 1988, but the tax court never sent those documents to Abeson.
 
 
 47
 Abeson's contention that the tax court never received these documents is not supported by any evidence. Abeson's contention that the tax court improperly ignored the documents also lacks support in the record. The tax court specifically stated on September 29, 1988 that it would notify the parties and provide Abeson with the documents only if it determined that disclosure was appropriate. The tax court's subsequent silence merely indicates that the court felt that disclosure of the October 7, 1988 documents was not warranted. We decline to infer from the court's silence that it improperly disregarded the documents when the court specifically stated that it would remain silent and take no action unless disclosure was deemed warranted.[8]
 
 
 48
 Because Abeson's claims of evidenitary error lack support in the record, the tax court's evidentiary rulings did not violate Abeson's due process rights.
 
 
 49
 Abeson also argues that the tax court violated due process by denying his Motion for Special Leave to File Motion to Revise Abeson Opinion and his Motion for Special Leave to File Motion for Reconsideration and for Trial De Novo. Because the tax court did not abuse its discretion in denying these motions, the denials did not violate due process.
 
 
 50
 V. Judicial Misconduct Warranting Recusal and Fraud Upon the Court
 
 
 51
 Abeson next argues that Judge Panuthos erred by failing to recuse himself pursuant to 28 U.S.C. § 455. We review a denial of a recusal motion for abuse of discretion. Preston v. United States, 923 F.2d 731, 733 (9th Cir.1991).
 
 
 52
 Abeson first alleges that recusal was appropriate because Judge Panuthos knowingly allowed the witness Frazier to perjure herself. We rejected a similar argument in United States v. Studley, 783 F.2d 934, 939 (9th Cir.1986), where Studley alleged that the district court judge knew that IRS agents had perjured themselves, but did nothing. We noted that the prejudice alleged to justify a recusal motion "must result from an extrajudicial source; a judge's prior adverse ruling is not sufficient cause for recusal." Id. Because the allegation in Studley involved the judge's performance while presiding over Studley's case, we held that the allegation was not extrajudicial and therefore could not form the basis for a request for recusal. Id. Similarly, Abeson's allegation does not involve prejudice arising from an extrajudicial source, and thus the denial of the recusal motion was not an abuse of discretion.
 
 
 53
 Abeson next argues that recusal was appropriate because of consistent misconduct by Judge Panuthos, which led to the transfer of this case to Tax Court Judge Fay. This argument is frivolous. Judge Panuthos, as a special trial judge, does not have statutory authority to render a final decision in cases assigned pursuant to 26 U.S.C. § 7443A(b)(4). See 26 U.S.C. § 7443A(c); Freytag, 111 S.Ct. at 2636 n. 3, 115 L.Ed.2d at 777. This case, therefore, was required to be transferred from Judge Panuthos so that the tax court could render a decision, and such a transfer in no way demonstrates that Judge Panuthos engaged in misconduct.
 
 
 54
 Abeson next alleges that recusal was appropriate because Judge Panuthos consistently used a "fanciful" and "peculiar" interpretation of relevancy when making various evidentiary rulings, inappropriately allowed a joinder of Judge Ruwe in order to quash the subpoena served on Judge Ruwe, fictionalized language concerning the 1978-79 grand jury, lacked character and judicial temperament, lost important documents, and "fraudulently" granted false motions. Because none of these allegations of bias stems from an extrajudicial source, none can form the basis for a recusal motion. See Studley, 783 F.2d at 939.
 
 
 55
 Abeson also argues that the Abeson decision should be vacated, and a new trial granted, pursuant to Fed.R.Civ.P. 60(b)(3), which allows a decision to be vacated when a party has discovered "fraud ..., misrepresentation, or other misconduct of an adverse party." Such "fraud on the court" "may occur when the acts of a party prevent his adversary from fully and fairly presenting his case or defense." Abatti v. Commissioner, 859 F.2d 115, 118 (9th Cir.1988). The tax court's denial of the motion to vacate was not an abuse of discretion. See Molloy, 878 F.2d at 315.
 
 
 56
 Abeson first argues that Judge Ruwe and Judge Panuthos acted together to prevent Judge Ruwe from testifying. There is no evidence that Judge Ruwe perpetrated fraud or misrepresentation on the court, however. Abeson argues that Judge Ruwe committed perjury in his declaration, but, as discussed supra Part II(D), that argument is not supported by any evidence. The allegation that Judge Panuthos acted to prevent Judge Ruwe from testifying also lacks evidentiary support. While Judge Panuthos both quashed the subpoena of Judge Ruwe, and made an evidentiary ruling that precluded a memo written by Judge Ruwe from being admitted into evidence, there is no evidence that Judge Panuthos perpetrated any fraud or misrepresentation. Additionally, Rule 60(b)(3) applies only to fraud committed by an adverse party, and Judge Panuthos was not the adverse party in this case; the IRS was.
 
 
 57
 Abeson next argues that Judge Panuthos permitted fraud to be perpetrated on the court when he knowingly allowed the witness Frazier to perjure herself. As discussed previously, supra Part II(A), Abeson has not demonstrated that Frazier committed perjury, and as a result cannot demonstrate that Frazier's statements constituted fraud on the court.
 
 
 58
 Abeson also contends that Judge Panuthos committed fraud on the court when he refused to admit into evidence a memo written by Judge Ruwe on the basis of the government process privilege, 26 U.S.C. § 6103(b)(2) and 5 U.S.C. § 552(b)(7)(E). Abeson, however, has failed to demonstrate that Judge Panuthos's evidentiary rulings were an abuse of discretion, see supra Part IV, let alone that Judge Panuthos fraudulently refused to admit evidence.
 
 
 59
 Abeson finally argues that the IRS and the Tax Court denied Abeson his due process rights and that this amounted to fraud upon the court. As we held supra Part IV, Abeson has made no meritorious due process arguments, and thus the tax court did not abuse its discretion when it rejected this fraud on the court argument.
 
 
 60
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Abeson also seems to imply that the tax court failed to make factual findings pertaining to other relevant issues. Abeson, however, has failed to specify what additional findings were necessary. Because the tax court opinion itself set out its factual findings in some detail, see Abeson v. Commissioner, p 90,190 PH Memo TC 90-881, 882-94 (1990), Abeson's general allegations do not establish abuse of discretion on the part of the tax court
 
 
 [2]
 Abeson also argues that Pappas's lie was disclosed when "Special Agent Dragics recognized their [the codes] existence but refused to discuss them on the basis of law enforcement privilege for 'classified' information." Dragics's refusal to discuss the codes is not relevant to the question of whether the service centers actually did maintain the codes, and his statements do not contradict Pappas's testimony
 
 
 [3]
 Abeson argues that an inconsistency exists because the opinion talks about "a" grand jury investigation, while the letter discusses "its" [the U.S. Attorney's] grand jury investigation. The court's use of "a" in stead of "it" has no significance. In both the opinion and the letter it is clear that it is the U.S. Attorney's office that is seeking authorization to extend its investigation
 
 
 [4]
 Abeson relies on Respondent's Supplemental Response to Petitioners' First Set of Interrogatories to support the contention that Reimer disclosed grand jury information. This document, however, was never put into evidence, and we declined to take judicial notice of it
 
 
 [5]
 On appeal Abeson has proffered a portion of Respondent's Supplemental Response to Petitioners' First Set of Interrogatories. We declined to take judicial notice of this document. See supra note 4
 
 
 [6]
 Abeson also argues that the "Tax Court has not yet made a clear determination regarding the existence or non-existence of the 1978/79 grand jury investigation of Berg." While the tax court's opinion does not specifically address the existence of the 1978-79 grand jury investigation, it does strongly imply the existence of such an investigation. See Abeson, p 90,190 PH Memo TC at 888 (finding that in February 1979, the U.S. Attorney requested authorization to extend the scope of a grand jury investigation, thus implying the existence of a grand jury investigation in early 1979)
 
 
 [7]
 The IRS also argues that it should not be estopped from taking into account taxpayers' refund checks when determining deficiencies or amounts paid. Because Abeson never articulated any theory based on estoppel, we do not address the merits of the government's position on this issue
 
 
 [8]
 Abeson also argues that the tax court docket sheets do not reflect receipt of the in camera material, and thus that Judge Panuthos must never have received any of the documents. It is true that the docket sheets do not note the receipt of in camera materials. The docket sheets, however, are not proof of receipt or non-receipt of documents